S12A1925. HEYWOOD v. THE STATE.
(743 SE2d 12)

NAHMIAS, Justice.

Jason Leon Heywood appeals his convictions for malice murder and other crimes related to the shooting death of Andrew Wilson. Appellant challenges the trial court's refusal to continue the trial and empanel new prospective jurors based on a remark made during voir dire, his absence from bench conferences, the admission of certain blood spatter testimony, and the constitutionality of his sentence of life imprisonment without the possibility of parole. We affirm.[1]

1. The evidence presented at trial, viewed in the light most favorable to the verdict, showed the following. On April 28, 2010, Appellant's cousin, Claude Keith Hunter II, drove Appellant to an apartment complex parking lot where Hunter had previously arranged to sell the victim a quantity of marijuana for $1,250. Hunter parked his Saturn sedan beside the victim's Nissan Altima, told Appellant to wait in the car, and then left the Saturn to go sit in the front passenger seat of the victim's car. As Hunter was making the drug sale, Appellant jumped into the back seat of the victim's car, pulled out a gun, and demanded all the victim's money. When the victim tried to

---

[1] The crimes occurred on April 28, 2010. On September 15, 2010, Appellant was indicted in Clayton County with Claude Keith Hunter II on charges of malice murder, four counts of felony murder, aggravated assault with a deadly weapon, aggravated assault with intent to rob, armed robbery, four counts of possession of a firearm during the commission of a crime, concealing the death of another, and tampering with evidence. Appellant was also indicted on two counts of possession of a firearm by a convicted felon, but the State later nolle prossed those charges. After a trial on September 19-23, 2011, the jury convicted Appellant of all the remaining charges. The felony murder convictions were vacated by operation of law, and the armed robbery and two aggravated assault convictions merged. The trial court sentenced Appellant to life in prison without the possibility of parole for malice murder plus a total of forty years consecutive for the convictions for firearm possession during the commission of a crime, concealing the death of another, and tampering with evidence. On October 21, 2011, Appellant filed a motion for new trial, and after a hearing on April 24, 2012, the trial court summarily denied the motion. Appellant timely appealed, and the case was docketed in this Court for the September 2012 term and orally argued on November 6, 2012.

escape, Appellant hit him in the head with the gun and then used the victim's seatbelt to choke him. The victim continued to struggle, and Appellant announced, "I'm fixing to shoot him, I'm fixing to shoot him," and then shot the victim once in the back. The victim slumped over, and Appellant took cash from his pockets. Witnesses saw Appellant and his cousin wipe down the victim's car before fleeing in the Saturn. The victim died at the hospital from the gunshot wound. A service receipt for the Saturn was found on the ground near the victim's car.

Hunter pled guilty to armed robbery and tampering with evidence and testified against Appellant at trial. Two other witnesses identified Appellant and Hunter in photographic lineups as the assailants. The medical examiner testified that stippling marks near the bullet's entrance wound showed that the gun was within arm's length of the victim when he was shot, and a crime scene investigator testified that the blood spatter pattern in the victim's car indicated that the gunshot came from the back seat and not the passenger side of the front seat. The State also presented similar transaction evidence of Appellant's prior armed robbery of a woman in a pharmacy parking lot.

When viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SC 2781, 61 LE2d 560) (1979). "'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (citation and punctuation omitted).

2. Appellant first contends that the trial court erred in denying his request to postpone the trial to empanel a new set of prospective jurors after one prospective juror made an allegedly prejudicial remark during voir dire. Our review of this issue is limited to determining whether the trial court abused its discretion in denying Appellant's request. See *Sharpe v. State*, 272 Ga. 684, 687-688 (531 SE2d 84) (2000).

During voir dire, the State asked whether Appellant looked like anyone the prospective jurors knew. Juror 35 answered yes, and she then related a story about being assaulted outside a bank by a man brandishing a gun. At the end of the story, Juror 35 said that Appellant reminded her of the assailant. Appellant objected, and the attorneys for both sides approached the bench to discuss the matter with the trial judge.

At the conclusion of the bench conference, the judge announced in open court the topic of the discussion and said that both parties

agreed that Appellant was not, in fact, the person who assaulted Juror 35 outside the bank. The court instructed the prospective jurors to disregard Juror 35's statement and asked for a show of hands from any jurors who felt that her statement "might affect their decision in this case" or prevent them from being "fair and impartial." No hands were raised. At the end of voir dire, Juror 35 was struck for cause.

Our decision in *Cotton v. State*, 279 Ga. 358 (613 SE2d 628) (2005), is instructive. In *Cotton*, a prospective juror who was a high school administrator said during voir dire that he had dealt with the defendant in connection with unspecified "discipline problems" some years before. Id. at 360. The defendant objected, and the trial court excused the juror. The court reminded the remaining prospective jurors that the excused juror did not explicitly identify the defendant as a disciplinary problem, and when the court asked if anyone would be prejudiced by the excused juror's remark, no one answered in the affirmative. See id. This Court found no abuse of discretion in the trial court's decision not to empanel a new set of prospective jurors. See id.

Here, the matter to which the prospective juror referred was more serious, but unlike the defendant in *Cotton*, Appellant was not actually implicated in the matter referenced. Juror 35 merely said that Appellant reminded her of the man who had assaulted her, but she did not suggest even implicitly that Appellant was in fact that man. The trial court made certain that the prospective jurors were not confused about this point, instructing them explicitly that both parties agreed that Appellant was not, in fact, the perpetrator of the assault on Juror 35. Moreover, as in *Cotton*, the prospective juror who made the potentially prejudicial remark was excused, and the trial court took " 'the additional corrective action' " of asking whether the excused juror's remark would prevent the remaining jurors " 'from being fair and impartial, and no prospective juror gave any affirmative response.' " Id. (citation omitted). Compare *Bell v. State*, 311 Ga. App. 289, 291-293 (715 SE2d 684) (2011) (reversing a defendant's rape conviction for failure to empanel a new set of prospective jurors where no clarifying and curative instructions were given after a prospective juror wondered aloud whether the defendant was the person who raped his grandmother because the defendant and his grandmother's rapist shared the same name). Accordingly, we conclude that the trial court did not abuse its discretion by denying Appellant's request to postpone the trial to empanel a new set of prospective jurors.

3. Appellant next claims that his absence from 13 bench conferences held during the trial violated his constitutional "right to be present, and see and hear, all the proceedings which [we]re had against him on the trial before the [c]ourt." *Wade v. State*, 12 Ga. 25,

29 (1852) (emphasis omitted). We disagree. Bench conferences, or sidebars, are a common occurrence during jury trials, allowing the attorneys for the parties to discuss matters with the judge without being heard by the jury and without the delays inherent in excusing the jurors from the courtroom and bringing them back in. Most bench conferences involve questions of law and consist of "essentially legal argument about which the defendant presumably has no knowledge," *Huff v. State*, 274 Ga. 110, 111 (549 SE2d 370) (2001), and many other bench conferences involve logistical and procedural matters, see *Parks v. State*, 275 Ga. 320, 324-325 (565 SE2d 447) (2002).

A defendant's presence at bench conferences dealing with such topics bears no "relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," and the constitutional right to be present does not extend to situations where the defendant's "presence would be useless, or the benefit but a shadow." *Snyder v. Massachusetts*, 291 U. S. 97, 105-107 (54 SC 330, 78 LE 674) (1934). Thus, a defendant's right to be present is not violated by his absence from such bench conferences. See, e.g., *Parks*, 275 Ga. at 324-325 (concluding that the defendant's right to be present was not violated by his absence from bench conferences on the admissibility of testimony and other evidence, the merits of objections regarding trial procedures, the content of a limiting instruction, the scheduling of a witness's testimony, and the prosecutor's request for a 15-minute delay in the trial); *Huff*, 274 Ga. at 111 (holding that the defendant's right to be present was not violated by his absence from a jury charge conference and an in-chambers conference discussing whether the defendant's custodial statement should go out with the jury); *Smith v. State*, 319 Ga. App. 590, 596 (737 SE2d 700) (2013) (rejecting the defendant's right to be present claim where the challenged sidebars involved only "housekeeping matters or the merits of evidentiary objections").

Of the 13 bench conferences Appellant mentions, all but one involved only legal arguments regarding objections and proper trial procedure or logistical matters such as the order in which witnesses would be called and when to take breaks in the trial proceedings. Appellant's absence from these discussions did not violate his constitutional right to be present. See *Parks*, 275 Ga. at 325; *Huff*, 274 Ga. at 111.

The remaining bench conference was the one described in Division 2, involving what to do about Juror 35's remark. Appellant was entitled to be present during this discussion, because the topic included whether to replace the prospective jurors. See *Zamora v. State*, 291 Ga. 512, 518 (731 SE2d 658) (2012) (holding that the defendant "clearly had a constitutional right to be present during the

proceedings at which one of the jurors trying his case was removed"); *Sammons v. State*, 279 Ga. 386, 387 (612 SE2d 785) (2005) ("Proceedings at which the jury composition is selected or changed are a critical stage at which the defendant is entitled to be present."). However,

> [a] defendant "may personally waive his right to be present at a stage in the trial, or counsel may waive this right for the defendant. But 'in order for the waiver of counsel to be binding on the defendant, it must be made in his presence or by his express authority, or be subsequently acquiesced in by him.'"

*Zamora*, 291 Ga. at 519. See also *Ward v. State*, 288 Ga. 641, 646 (706 SE2d 430) (2011) (explaining that acquiescence "'means a tacit consent to acts or conditions, and implies a knowledge of those things which are acquiesced in'" (citations omitted)).

As explained previously, the trial judge advised those in the courtroom, including Appellant, about the topic of this bench conference at the time. Appellant's failure to voice any objection to his absence from this bench conference, either directly or through counsel, constituted acquiescence in his counsel's waiver of his right to be present. See *Zamora*, 291 Ga. at 520; *Jackson v. State*, 278 Ga. 235, 237 (599 SE2d 129) (2004) (holding that the defendants "acquiesced in the proceedings [occurring in their absence] when their counsel made no objection and [they] thereafter remained silent after the subject was brought to their attention"); *Kennedy v. State*, 274 Ga. 396, 397 (554 SE2d 178) (2001) (holding that the defendant acquiesced where "all of the bench conferences in question took place while [the defendant] was in the courtroom, and she voiced no objection to them").

Accordingly, this enumeration of error lacks merit.

4. Appellant argues that the trial court erred in allowing a State witness to offer expert testimony about the blood spatter pattern in the victim's car, because the expert's opinion was not reduced to writing and made available to Appellant's counsel at least ten days prior to trial, which Appellant claims is required by OCGA § 17-16-4 (a) (4). Pretermitting whether an objection on this ground was properly raised at trial, we conclude that Appellant's claim is meritless.

(a) Crime scene investigator Donald K. MacGillivary was included on the State's witness list and completed a written crime scene report that was made available to the defense before trial. At trial, MacGil-

livary testified in detail about the collection of evidence at the crime scene, including his examination of the inside of the victim's car and his recovery of blood samples that were later sent to a lab for testing.

When the State then asked, "In your visual observation and your training, what was the blood spatter consistent with?," Appellant's counsel objected based on lack of foundation for the blood spatter testimony. The trial court instructed the State to lay more foundation, and the State elicited MacGillivary's training and experience in analyzing blood spatter patterns. MacGillivary then testified that the blood spatter pattern in the car was consistent with the victim's having been shot from behind. MacGillivary explained that he found no high velocity blood misting on the center console, the steering wheel, or the passenger side door of the front seat, which he would have expected to find if the victim had been turned toward his door and shot in the back by someone sitting with him in the front seat (namely, Hunter instead of Appellant).

The State then asked MacGillivary to diagram the interior of the victim's car to show where he would have expected to find the blood misting if the victim had been shot by someone in the front seat. At this point, Appellant's counsel objected to the witness's testifying outside his area of expertise and without the State's providing notice of his expert testimony or his report. The trial court overruled the objection, the State continued its questioning, and MacGillivary indicated on the diagram where he would have expected to (but did not) find blood misting if the victim had been shot from the front seat. On cross-examination, MacGillivary acknowledged that his crime scene report did not include any opinion about where the shooter was positioned based on the blood spatter pattern, and defense counsel challenged him on that opinion and many other issues.

(b) The State argues that even if Appellant preserved this claim for appellate review, it fails on the merits, because OCGA § 17-16-4 (a) (4) only requires pretrial disclosure of an expert's written report, and it is undisputed that MacGillivary did not produce a written report on his blood spatter opinion before trial. The State cites *Hullander v. State*, 271 Ga. 580 (522 SE2d 658) (1999), and *Garey v. State*, 273 Ga. 133 (539 SE2d 123) (2000), where this Court rejected claims that OCGA § 17-16-4 (a) (4) required the State to generate written reports or summaries of the findings and conclusions of its expert witnesses to provide to the defense before trial, holding that the statute only "required that if such a report exists[,] it be made available to the defendant." *Garey*, 273 Ga. at 136. Accord *Hullander*, 271 Ga. at 581.

However, OCGA § 17-16-4 (a) (4) has since been amended to add the following italicized sentence:

> The prosecuting attorney shall, no later than ten days prior to trial, or as otherwise ordered by the court, permit the defendant . . . to inspect and copy or photograph a report of any physical or mental examinations and of scientific tests or experiments, including a summary of the basis for the expert opinion rendered in the report, or copies thereof, if the state intends to introduce in evidence in its case-in-chief or in rebuttal the results of the physical or mental examination or scientific test or experiment. *If the report is oral or partially oral, the prosecuting attorney shall reduce all relevant and material oral portions of such report to writing and shall serve opposing counsel with such portions no later than ten days prior to trial.* Nothing in this Code section shall require the disclosure of any other material, note, or memorandum relating to the psychiatric or psychological treatment or therapy of any victim or witness.

Ga. L. 2003, p. 154, § 5. Thus, if MacGillivary made even an oral report of his opinions regarding the blood spatter evidence before trial, the prosecutor was required to prepare a written report of the opinion and its basis and to serve the report on Appellant's counsel no later than ten days before trial. However, Appellant has pointed to nothing in the record to prove that MacGillivary ever made such an oral report before he testified. In the absence of such a showing, Appellant cannot establish a violation even of the amended OCGA § 17-16-4 (a) (4).

5. Finally, Appellant argues that his sentence of life without the possibility of parole violates the ban on ex post facto laws. However, Appellant did not raise this claim at trial, and he cannot raise it for the first time on appeal. See *Duvall v. State*, 290 Ga. 475, 476 (722 SE2d 62) (2012).

In any event, the claim lacks merit. In 1993, the General Assembly authorized life without parole as an alternative to a death sentence, but only where the State filed a notice of intent to seek the death penalty and the factfinder found at least one statutory aggravating circumstance. See *State v. Ingram*, 266 Ga. 324, 326 (467 SE2d 523) (1996). In 2009, the General Assembly amended the murder statute, OCGA § 16-5-1, to authorize life without parole as a sentence in *all* murder cases. See Ga. L. 2009, p. 223, § 1. The 2009 Act explicitly provided in § 10, "A person may be sentenced to life without parole without the prosecutor seeking the death penalty under the

laws of this state." Moreover, §§ 6 and 7 of the 2009 Act repealed OCGA §§ 17-10-31.1 and 17-10-32.1, which required the finding of a statutory aggravating circumstance before a sentence of life without parole could be imposed. See *Williams v. State*, 291 Ga. 19, 20 (727 SE2d 95) (2012). The 2009 Act provided that the effective date of these sections was April 29, 2009. See Ga. L. 2009, p. 223, § 8. Appellant killed the victim on April 28, 2010, almost exactly one year *after* the law was changed to allow a sentence of life without the possibility of parole in all murder cases.

Appellant correctly notes that in 2011, the year after he killed the victim, the General Assembly expressly required the *codification* of § 10 of the 2009 Act in the Official Code of Georgia Annotated as OCGA § 17-10-16.1. See Ga. L. 2011, p. 752, § 17 (3) (effective May 13, 2011) ("Title 17 of the Official Code of Georgia Annotated, relating to criminal procedure is amended in: . . . Article 1 of Chapter 10, relating to procedure for sentencing and imposition of punishment, by codifying the text of Section 10 of [the 2009 Act] as Code Section 17-10-16.1."). But Appellant cites no authority, and we are aware of none, supporting his claim that a validly enacted law takes effect for ex post facto purposes only after it has been added to the compilation of Georgia laws contained in the Georgia Code. There is one old case holding, under a then-existing Code section that specified how laws must be published, that "[u]pon the enactment of a new penalty for an offence, the former penalty is not superseded until the statute prescribing the new one takes effect; and this, under the Code, cannot happen until the statute has been duly published." *Grinad v. State*, 34 Ga. 270, 272 (1866). Our current Constitution contains a general publication requirement for new laws, see Ga. Const. of 1983, Art. III, Sec. V, Par. I ("The General Assembly shall provide for the publication of the laws passed at each session."), but the Code now specifies that laws become effective on July 1 or January 1, whichever comes first after the legislation is approved by the Governor or becomes law without his approval, "[u]nless a different effective date is specified in an Act." OCGA § 1-3-4. The Code also provides that, "[a]fter they take effect, the laws of this state are obligatory upon all the inhabitants thereof. Ignorance of the law excuses no one." OCGA § 1-3-6. Likewise, the longstanding view in the federal courts is that, absent any provision fixing an exact date and time that a bill is to take effect, the bill becomes effective when the President signs it into law or when it becomes law without the President's signature, and that time is the basis for ex post facto analysis. See *Burgess v. Salmon*, 97 U. S. 381, 383-384 (24 LE 1104) (1878). See also *Lapeyre v. United States*, 84 U. S. (17 Wall.) 191, 199 (21 LE 606) (1873) ("Acts take effect before they are printed or published."); *United States v. Casson*, 434 F2d

415, 416, 419-420 (D.C. Cir. 1970) (rejecting an ex post facto claim based on a bill the President signed into law in Texas about six hours before the defendant committed the crimes for which he was convicted in Washington, D.C.).

Neither *Grinad* nor the effective-date view treats codification of a new law as the trigger point for ex post facto analysis. We need not decide in this case whether publication is the trigger point, because the statutory amendment at issue here took effect and was published well before Appellant killed the victim. See Ga. L. 2009, p. 223. Thus, even if this contention had been properly preserved, it lacks merit.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 28, 2013 —
RECONSIDERATION DENIED APRIL 10, 2013.

*William C. Lea, McNeill Stokes*, for appellant.

*Tracy Graham-Lawson, District Attorney, Elizabeth A. Baker, Luana P. Nolin, Erman J. Tanjuatco, Charles A. Brooks, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine T. Parvis, Assistant Attorney General*, for appellee.