## S13A0068. MATHIS v. THE STATE.
### (743 SE2d 393)

HINES, Justice.

Jamall DeCarlos Mathis appeals his convictions and sentences for felony murder, aggravated battery, cruelty to a child, and battery, all in connection with the death of his infant son, Ja'Mari Myckahi Jones. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Ja'Mari was born March 26, 2008, when Mathis was 18 years old. During the pregnancy of the mother, Tiasha Jones, Mathis provided no financial or other support to her, he threatened to have someone punch Tiasha in the stomach, and, when she was six months pregnant, he threw a spray bottle at her during an argument.

While Ja'Mari was alive, Mathis saw him less than ten times; his purchases for supplies and gifts for the baby totaled less than $200. In May 2009, Tiasha began legal proceedings to gain child support from Mathis, and a hearing was scheduled for October 2009; in

---

[1] The crimes occurred on September 16, 2009. On March 10, 2010, a Clayton County grand jury indicted Mathis for malice murder, felony murder while in the commission of aggravated battery, felony murder while in the commission of aggravated assault, felony murder while in the commission of cruelty to a child, two counts of aggravated battery, aggravated assault, cruelty to a child, and battery. Mathis was tried before a jury November 8-12, 2010, and found guilty of all charges except malice murder, on which no verdict was entered. On November 12, 2010, Mathis was sentenced to life in prison without the possibility of parole for felony murder while in the commission of aggravated battery, twenty years in prison for aggravated battery, twenty years in prison for cruelty to a child, and twelve months in prison for battery, all to be served consecutively; an order of nolle prosequi was entered on the charge of malice murder, and the remaining guilty verdicts were either vacated by operation of law or merged with crimes for which sentences were entered. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Mathis moved for a new trial on November 12, 2010, amended the motion on July 19, 2011, and again on August 17, 2011; the motion, as amended, was denied on January 3, 2012. On January 30, 2012, Mathis filed a notice of appeal; the appeal was docketed in this Court for the January 2013 term and submitted for decision on the briefs.

August 2009, Mathis asked Jones to dismiss the complaint, but she did not. Ja'Mari did not spend a night with Mathis until August 2009. The second time he spent the night with Mathis, Ja'Mari had a swollen knee and limped the next day; Mathis said that Ja'Mari "probably fell."

The third time Ja'Mari spent the night with Mathis was the night of September 15-16, 2009, when Ja'Mari was killed; the visit was at Mathis's instigation. At the time, Mathis, and his mother, brother, sister, and infant niece were staying at the home of Mathis's aunt while a new residence for Mathis's family was being arranged. Mathis and his brother, Jeremy Lacey, went to pick up Ja'Mari at Tiasha's home. When Mathis arrived, Ja'Mari cried; on the previous occasions that Mathis saw him, Ja'Mari had not done that. When they returned to the aunt's home, Mathis fed Ja'Mari. At the time, Mathis was sleeping on a pallet on the floor of the bedroom of his cousin, Robert Washington. By 10:00 p.m., Mathis had put Ja'Mari to bed on the pallet, and Washington and Lacey were asleep on the bed; Mathis was in another room on a computer. Around 11:00 p.m., Mathis called Tiasha and said that Ja'Mari had been on a bed with his mother and niece, had fallen off, hit his head, and that Mathis was putting ice on the wound. Mathis called Tiasha again, and the two talked until 3:00 a.m. At that time, Washington woke up and saw Ja'Mari look at him; he noticed nothing amiss. Washington woke again at 6:25 a.m. and left the bedroom. Lacey awoke at 9:00 a.m. and left the bedroom; Mathis and Ja'Mari were then asleep on the pallet.

After 9:00 a.m., Mathis called out that Ja'Mari was not breathing. An ambulance was summoned: a paramedic arrived within three minutes of the call; Ja'Mari was not breathing, had a weak pulse, and his skin was still warm and dry, all indicating his respiratory distress occurred very recently; and, the knot on his head increased in size during the trip to the hospital, also indicating a recent injury. At the hospital, Mathis stated that Ja'Mari fell off the bed. Ja'Mari died within 24 hours from blunt force trauma to the head; he also had wounds to his chest and right arm, and an injury to the mouth that was consistent with something being jammed inside it.

Mathis testified that: on the night Ja'Mari last stayed with him, he put Ja'Mari on the bed with Washington and Lacey[2] at 10:00 p.m., and went to another room; about 20 minutes later, he heard a thump and found Ja'Mari on the bedroom floor; a small knot developed over Ja'Mari's right eye; he telephoned Tiasha and told her that Ja'Mari

---

[2] Washington and Lacey testified that Ja'Mari had not been put on the bed to sleep, only to dry off earlier in the evening, and that Mathis put Ja'Mari on the pallet on the floor to sleep.

had fallen and had a lump; she said to put ice on the injury, which he did, taking the child into the bathroom; the swelling over the eye subsided somewhat; he put Ja'Mari down on the pallet to sleep; he spoke on the telephone with Tiasha until 3:00 a.m.; then lay down on the pallet next to Ja'Mari, who was asleep and breathing properly; he awoke the next morning and went to the bathroom; when he returned to Washington's bedroom, he saw that the left side of Ja'Mari's head was swollen; and he called for help.

The only medical evidence presented at trial was that Ja'Mari's injuries were not consistent with being inflicted at 11:00 p.m. the previous night, nor with having fallen from the bed, the top of which was 28 inches above the floor; the injuries to his head were such that he would have shown symptoms immediately, including being unconscious or nearly so. In Washington's bedroom, a wet washcloth with blood on it was found behind the dresser; vomit was found on the floor. Two baseball bats belonging to Washington were also found; Ja'Mari's injuries were consistent with being struck with such a bat, but no physical evidence was introduced directly linking the bats to the blows Ja'Mari suffered. Less than a month after Ja'Mari's death, Mathis sent Tiasha text messages saying that he wished to have another child with her and inquiring if she would be receiving any money because of Ja'Mari's death.

1. Mathis asserts that the evidence was insufficient to support his convictions, contending that the State presented only circumstantial evidence that did not exclude all reasonable hypotheses except that of his guilt. See former OCGA § 24-4-6.

> Questions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

*Rogers v. State*, 290 Ga. 18, 23 (4) (717 SE2d 629) (2011) (Citations and punctuation omitted.).

Mathis argues that the evidence did not exclude the possibility that another person in the house committed the crimes and showed only that he was present and had a financial motive to kill Ja'Mari. See *Moore v. State*, 255 Ga. 519 (340 SE2d 888) (1986). But this characterization of the evidence ignores testimony that Ja'Mari had previously been injured when in Mathis's care, and that his version of events, particularly relating to putting Ja'Mari on the bed to go to

sleep, was contradicted by both Washington and Lacey; it also ignores testimony regarding Mathis's behavior after Ja'Mari's death. Resolving conflicts in the evidence and determining the credibility of witnesses is for the jury. *Smith v. State*, 280 Ga. 161, 162 (1) (625 SE2d 766) (2006). The evidence authorized the jury to find Mathis guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); *Smith*, supra.

2. Mathis requested that the jury be instructed on the law regarding involuntary manslaughter under OCGA § 16-5-3 (a),[3] urging that he could have been found guilty of causing Ja'Mari's death by leaving him to sleep on the bed with Washington and Lacey, which could be considered to constitute the misdemeanor of reckless conduct under OCGA § 16-5-60;[4] he also asserts that failing to promptly seek medical care could constitute reckless conduct.

As to placing the child on the bed in the manner that Mathis testified he did, he cites no authority for concluding that in doing so, he "disregard[ed] a substantial and unjustifiable risk," endangering Ja'Mari's safety such that it was "a gross deviation from the standard of care which a reasonable person would exercise in the situation," all of which would be required to find that Mathis committed the misdemeanor of reckless conduct as defined by OCGA § 16-5-60, and we find no such authority. In any event, even if that act constituted a misdemeanor, the undisputed evidence was that a fall from the bed could not have caused Ja'Mari's death, as would be required under OCGA § 16-5-3 (a). See *State v. Jackson*, 287 Ga. 646, 650-651 (2) (697 SE2d 757) (2010); *Brown v. State*, 269 Ga. 67, 69 (2) (495 SE2d 289) (1998).[5]

---

[3] OCGA § 16-5-3 (a) reads:
> A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

[4] In pertinent part, OCGA § 16-5-60 reads:
> . . .
> (b) A person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.
> . . .

[5] Similarly, there was no testimony that the injuring of Ja'Mari's right arm, which was alleged in the indictment to constitute the misdemeanor of battery, could have caused his death.

Regarding the failure to get medical attention, as the trial court noted during the charge conference, there was no evidence that Mathis failed to get medical attention for Ja'Mari on the morning of September 17, 2009; Mathis and others testified that when he awoke and recognized the child in distress, he promptly acted to get help, including calling for an ambulance. Although Mathis asserted during the charge conference that medical help could have been summoned at 11:00 p.m. the previous night, the only evidence of an injury to Ja'Mari at that time was Mathis's own testimony, which was that Ja'Mari was calm, the injury did not give a cause for "panic," and that the swelling went down with the application of ice; he did not testify that Ja'Mari appeared in any distress. His testimony, if believed, was not evidence to support a finding that Mathis "disregard[ed] a substantial and unjustifiable risk," i.e., failing to seek immediate medical attention would endanger Ja'Mari's safety, such that it was "a gross deviation from the standard of care which a reasonable person would exercise in the situation," as would be required to find that Mathis committed the misdemeanor of reckless conduct as defined by OCGA § 16-5-60. See *Banta v. State*, 282 Ga. 392, 398 (5) (651 SE2d 21) (2007). And again, the undisputed testimony was that the cause of Ja'Mari's death was blunt force trauma, not failure to seek medical care. See *Jackson*, supra; *Brown*, supra. See also *Bostic v. State*, 284 Ga. 864, 865-866 (2) (672 SE2d 630) (2009).

3. The trial court instructed the jury on the defense of accident, using the pattern charge. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.41.30 (4th ed. 2007). In doing so, the court omitted the phrase "criminal negligence" where it appears in the instruction; as this Court has noted, that phrase is "in brackets, indicating that it should be charged *when applicable*." *Yeager v. State*, 281 Ga. 1, 3 (2) (635 SE2d 704) (2006) (Emphasis supplied.) Despite the trial court's correct conclusion that the evidence did not support a finding of reckless conduct, see Division 2, supra, Mathis argues that this case was nonetheless one in which the phrase "criminal negligence" is applicable to an instruction on accident. However, Mathis made no objection below to the instruction as given. Thus, this Court's review is limited to a determination of whether the trial court's instruction constituted "plain error." See OCGA § 17-8-58.[6]

---

[6] OCGA § 17-8-58 reads:
 (a) Any party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such objection before the jury retires to deliberate. Such objections shall be done outside of the jury's hearing and presence.

This Court set forth the test for plain error under OCGA § 17-8-58 (b) in *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

Id. (Citations and punctuation omitted.)

In the first instance, it is questionable whether any instruction on accident was warranted in this case as Mathis did not admit to committing any act that resulted in the death of Ja'Mari. See *Mangrum v. State*, 285 Ga. 676, 680-681 (6) (681 SE2d 130) (2009). Assuming that such an instruction was warranted, see *White v. State*, 291 Ga. 7, 9 (2) (727 SE2d 109) (2012), and disregarding whether there might be error, clear or otherwise, in the trial court's omission of the phrase "criminal negligence" under the facts of this case, there is no likelihood that the omission affected the outcome of the trial. The instruction as given informed the jury that for it to find Mathis not guilty by reason of accident, there must be "no criminal scheme, undertaking, or intention." Mathis now argues that the jury should have been informed instead that there must be "no criminal scheme, undertaking, intention, **or criminal negligence**." Thus, the effect of the trial court's omission was to remove from the jury's consideration one factor, to wit, criminal negligence, that would be required for it to find that Mathis was not guilty by reason of accident. Put another way, what Mathis now claims to be the proper instruction would require the jury to make an additional finding before it could find him not guilty than it had to do under the instruction given at trial.

---

(b) Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. Such plain error may be considered on appeal even if it was not brought to the court's attention as provided in subsection (a) of this Code section.

Accordingly, as the instruction given actually made it easier for the jury to acquit Mathis than the instruction he now prefers would, we cannot conclude that the omission of the term "criminal negligence" from the instruction on accident affected the outcome of his trial.

4. Mathis was sentenced to life in prison without the possibility of parole. Under OCGA § 16-5-1 (d), that is one of the possible punishments for murder, and has been since the 2009 amendment to OCGA § 16-5-1. *Heywood v. State*, 292 Ga. 771, 777 (5) (743 SE2d 12) (2013). Although Mathis enumerates as error the failure of the State to seek the death penalty, and to provide notice of doing so, the argument is misplaced; such was a requirement for imposition of the penalty of life without the possibility of parole *prior* to the 2009 amendment. Id. See also *Williams v. State*, 291 Ga. 19, 20 (1) (727 SE2d 95) (2012). After the 2009 enactment, a sentence of life without the possibility of parole is authorized "in *all* murder cases."[7] *Heywood*, supra (Emphasis in original.) Although Mathis notes that it was not until 2011, after his trial, that the General Assembly expressly required the codification of the statement in the 2009 enactment that a sentence of life without the possibility of parole may be imposed when the State does not seek the death penalty, see OCGA § 17-10-16.1; Ga. L. 2011, p. 752, § 17 (3), that does not result in OCGA § 16-5-1 (d) being given ex post facto effect. *Heywood*, supra.

5. Finally, Mathis contends that his trial counsel failed to provide effective representation. In order to prevail on this claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783.

At the time of trial, Washington faced an indictment for alleged crimes that occurred six months after Ja'Mari was killed, and that

---

[7] On June 18, 2010, the State filed a notice of its intention to seek a sentence of life in prison without the possibility of parole.

were unrelated to that death. Mathis contends that counsel did not cross-examine Washington regarding any bias he might have had to color his testimony in favor of the State. However, Mathis presented no evidence of what might have been revealed by the cross-examination of Washington that he now contends should have been conducted. Thus, even assuming that trial counsel's cross-examination was deficient, Mathis fails to show how further cross-examination of Washington would have produced a different result in his trial. See *Felton v. State*, 283 Ga. 242, 247 (2) (e) (657 SE2d 850) (2008).

*Judgments affirmed. All the Justices concur, except Melton, J., who concurs in judgment only as to Division 2.*

DECIDED MAY 20, 2013.

*Neil A. Smith, John W. Kraus*, for appellant.

*Tracy Graham-Lawson, District Attorney, Elizabeth A. Baker, Frances C. Kuo, Assistant District Attorneys, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, David A. Bikoff, Assistant Attorney General*, for appellee.