306 Ga. 654
FINAL COPY

S19A0654.  HARDY v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Travaris Hardy was convicted of malice murder and other crimes in connection with the shooting death of Marcus Shirley. He appeals, contending that the evidence presented at his trial was legally insufficient to support his convictions; that his constitutional right to be present was violated because he was absent during a pretrial motions hearing; that his trial counsel provided ineffective assistance by waiving his presence at that hearing; and that the trial court violated his constitutional right to confrontation by permitting certain expert witnesses to testify. We affirm.[1]

---

[1] Shirley was killed on August 17, 2008. On April 27, 2012, a Fulton County grand jury indicted Appellant and Martin Mathews for malice murder, two counts of felony murder, armed robbery, aggravated assault, and possession of a firearm during the commission of a felony. Appellant alone was also charged with possession of a firearm by a convicted felon and felony murder based on that crime. Mathews alone was also charged with conspiracy

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. On the morning of August 16, 2008, Shirley and his girlfriend Majidah Whitfield drove from Mississippi to Atlanta with about $1,400 in cash, hoping to buy a pound of marijuana. Shirley asked his cousin Porsha Hill and her boyfriend Kevin Milton to find someone who could sell Shirley the marijuana. That night, Milton was connected through friends to a man known as "Mario," whom Milton had never met.

From 11:18 p.m. to 12:19 a.m., several calls were made between Hill's phone and a phone linked to Mario. During the last call, Mario

---

to violate the Georgia Controlled Substances Act and felony murder based on that crime. Appellant and Mathews's joint trial began on June 14, 2016, but after jury selection, the State nolle prossed all of the charges against Mathews. On June 27, the jury found Appellant guilty of all charges. The trial court sentenced him as a recidivist to serve two concurrent life sentences without the possibility of parole for malice murder and armed robbery, five consecutive years for possession of a firearm during the commission of a felony, and a five-year concurrent term for possession of a firearm by a convicted felon. The remaining counts were vacated or merged. Appellant filed a timely motion for new trial, which he amended with new counsel on March 1, 2018. After an evidentiary hearing, the trial court denied the motion on October 16, 2018. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the April 2019 term and submitted for decision on the briefs.

2

directed Milton to an apartment complex on Alison Court, and Shirley, Whitfield, Hill, and Milton then drove to the complex's parking lot in Whitfield's car. Mario, who was wearing a white shirt, red shorts, and a red hat, approached the car with a small bag of marijuana. Mario said that he did not want to bring the rest of the marijuana outside, so he, Shirley, and Milton walked around a corner and entered an apartment building while Whitfield and Hill waited in the car.

According to Milton, as he and Shirley followed Mario up a stairwell at the front of the building, he heard a voice say, "You know what time it is. Give it up." Milton then saw at least five men run out of a door on the second level of the building. Mario hit Milton in the head with a gun, and Shirley ran back outside. Mario and some of the men ran after Shirley while two of the assailants pushed Milton outside. Milton then heard a gunshot. One of Milton's assailants eventually left, while the other man, who had his shirt pulled up over his nose to partially cover his face, held Milton at gunpoint, took his phone, and repeatedly kicked him, saying,

3

"Where's the rest of the money at," and "Give me the money." Mario then ran up to the man and said, "We got the money." The man turned to look at Mario and his shirt fell away from his face. Referring to Milton, he asked, "What you want me to do with him?" Mario responded, "Do what you do." The man, with his face still uncovered, pushed Milton behind the building, but when he attempted to shoot Milton, his gun jammed and Milton escaped into the woods.

Tashina Williams lived on the second floor of an apartment building about 75 to 100 yards away from the parking lot where Shirley and his associates had parked. She heard a gunshot, looked outside, and saw four or five men gathered on Alison Court in front of her building arguing with a man whom she later identified as Shirley. She had seen some of the men before in the neighborhood; one of the men was wearing a red hat. Williams saw the men and Shirley fire several shots at one another; then Shirley collapsed and the rest of the men ran away in different directions. Williams saw that one of the assailants was bleeding from his leg, leaving a blood

trail. Another assailant yelled to him, "What's taking you so long?" The injured man replied, "I've been shot!" Williams then saw the man with the red hat come back and help the injured assailant flee across the street. At 12:32 a.m., Williams called 911.

Meanwhile, from the car, Whitfield and Hill saw Shirley follow Milton and Mario around the corner of the building but seconds later run out toward the entrance of the apartment complex onto Alison Court. Mario and another man ran after Shirley and shot once in his direction. Whitfield and Hill then got out of the car and attempted to find help. After hearing more gunshots, Whitfield and Hill returned to the car, drove out of the apartment complex, and found Shirley lying in the middle of Alison Court. He had been shot three times, once in each leg and once in the torso. His pants and his underwear, where he normally kept his money, were ripped, and of the $1,400, only a few dollars were left scattered around him. The two women put Shirley in the back seat to drive him to a hospital, but moments later, paramedics arrived. Shirley died from his gunshot wounds on the way to the hospital.

Investigators found a small amount of marijuana and a Hi-Point 9mm pistol with no clip on the floor of the back seat of Whitfield's car. Investigators also located a red hat near one of the buildings in the apartment complex and a Luger 9mm shell casing in a gutter on Alison Court close to where the fatal shooting occurred. On a nearby sidewalk, they found a blood trail that led across the street, and they took swabbings of the blood. Later that day, the lead detective for the case interviewed Whitfield, Hill, and Williams.[2] He interviewed Milton four days later.[3] The lead detective retired seven months later in March 2009, and the case went cold.

In May 2010, the police received a tip that Martin Mathews had been involved in Shirley's shooting. The new lead detective on

---

[2] Whitfield's and Hill's statements to the detective were similar to their testimony at trial. During Williams's police interview, she said that she had seen a group of three men with guns arguing with another group that included Shirley and two other men, all three of whom were unarmed. She claimed that the man who was shot in the leg had been in Shirley's group, and that a man wearing a black t-shirt and jeans had helped him flee across the street.

[3] During the interview, the detective showed Milton a photo lineup that did not include photos of Appellant or Mathews. Milton circled one of the photos in the lineup, telling the detective that the photo "kinda look[ed] like Mario." Milton also told the detective that he could not identify the man who had held him at gunpoint because "he was one of the ones with the shirt on his face."

the case then showed Milton a photo lineup containing Mathews's photo, and Milton immediately identified Mathews as the man he knew as "Mario." The detective also submitted the evidence collected from the crime scene for testing. The DNA profile obtained from the blood trail found at the crime scene was uploaded into the Combined DNA Index System (CODIS) and preliminarily matched to Appellant, whose DNA profile was in the system because he was a convicted felon.

On February 21, 2012, the detective located Appellant after he was arrested on an unrelated charge and interviewed him. When asked if he had ever been shot, Appellant said that he had been shot on Boulevard in 2000 and on Myrtle Drive in 2009. When the detective told Appellant that his blood was found on Alison Court just after Shirley's murder in 2008, however, Appellant said that he had been walking through the apartment complex when he saw two men in a physical altercation; he heard gunshots and ran, but then realized that he had been shot. Appellant claimed that he received medical treatment from a man named "Black" and did not go to a

7

hospital. When the detective asked if Appellant knew Mathews, Appellant said that he just knew Mathews "from [the] Alison Court neighborhood." At trial, the State presented testimony that Mathews's sister was the mother of Appellant's child, and medical records that showed that about a half an hour after Shirley was shot, Appellant went to a hospital emergency room complaining of a gunshot wound to his foot.

On March 15, 2012, the detective obtained a buccal swab from Appellant; DNA testing then confirmed that the blood trail found at the crime scene came from Appellant. On April 5, the detective showed Milton a photo lineup, and Milton identified Appellant as the man who had held him at gunpoint; Milton repeated that identification at trial. The detective testified that Williams also identified Appellant in a photo lineup as one of the men involved in the shooting, although at trial, Williams was not asked whether she could identify Appellant.

A medical examiner testified that Shirley had been shot three times — once in his abdomen, once in the right thigh, and once in

the left calf. A firearms examiner concluded that two bullets recovered from Shirley's body and the Luger 9mm shell casing found at the crime scene were not fired from the Hi-Point pistol found in the back seat of Whitfield's car and that at least two guns other than the Hi-Point pistol had been involved in the shooting.

Appellant did not testify. His defense theory was that he was merely a bystander when he and Shirley were shot. To support that theory, he pointed to Williams's prior statement to the police in which she claimed that Appellant was one of the men in Shirley's group, which was attacked by another group of men, and Milton's initial statement to the police in which he could not identify the man who had held him at gunpoint. Appellant argued that Milton had mistakenly identified him, because Appellant could not have held Milton at gunpoint at the same time that Appellant was shot with Shirley 75 to 100 yards away. To rebut that point, the State argued that Shirley and his friends pulled into the apartment complex more than 10 minutes before the time of the 911 call reporting the shooting, and that there would have been sufficient time for

9

Appellant to hold Milton at gunpoint and then, after Milton escaped, to run to the scene of the fatal shooting.

(b) Appellant contends that the evidence presented at trial and summarized above was legally insufficient to support his convictions because he was merely a bystander when Shirley was shot, Williams did not clearly see the shooting, and Milton did not accurately identify him as the assailant who held Milton at gunpoint. As we have often explained, however, "'the determination of a witness'[s] credibility, including the accuracy of eyewitness identification, is within the exclusive province of the jury.'" *Gadson v. State*, 303 Ga. 871, 873 (815 SE2d 828) (2018) (quoting *Reeves v. State*, 288 Ga. 545, 546 (705 SE2d 159) (2011)).

When properly viewed in the light most favorable to the jury's verdicts, the State presented ample evidence of Appellant's guilt. Milton and Williams each identified Appellant as one of the assailants in photo lineups, and Milton identified Appellant again at trial. Moreover, the evidence showed that one of the assailants was shot in the leg and left a blood trail as Mathews, Appellant's

10

family member, helped the wounded assailant flee the crime scene; the DNA obtained from the blood trail was matched to Appellant; and shortly after the shooting, Appellant went to a hospital to seek treatment for a gunshot wound to his foot. In addition, Appellant repeatedly lied during his police interview — about not being shot on Alison Court, about the altercation he supposedly witnessed (which he claimed was between only two men), about not seeking medical treatment at the hospital, and about his relationship with Mathews. This evidence was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); *Naji v. State*, 300 Ga. 659, 661 (797 SE2d 916) (2017) (explaining that "'[w]hile mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense'" (citation omitted)).

11

2. (a) From early in his case, Appellant was represented by Hope Demps of the Metro Conflict Defender's Office (MCDO). After a death in her family, Demps was on leave from work from May 2016 until June 7. Appellant's trial was specially set to start one week later on Tuesday, June 14. On Friday, June 10, Dennis Francis, Demps's supervisor in the MCDO, appeared for Appellant at a pretrial hearing and told the trial court that Demps had been in a car accident and was going to be on medical leave beginning that day. Francis said that he could try the case, but he requested a one-week continuance because of an out-of-town trip he had already planned. Noting prior delays in the case, the trial court denied the request. Francis then informed the court that he would arrange for someone else from his office to select the jury on the first day of trial and would return on the second day to try the case. Appellant was present throughout the hearing and did not object to Francis trying the case instead of Demps.

At about 4:00 p.m. on Monday, June 13, the trial court called a pretrial hearing on five motions that had been submitted that

morning by the lawyer for Appellant's co-defendant Mathews: two general demurrers; a motion to exclude the testimony of the State's medical examiner on constitutional grounds; a motion to exclude Hill's phone records based on the State's failure to provide a certificate of authentication for the records; and a motion for reconsideration of the court's order excluding Mathews's expert witness on identification. Natasha Heidari of the MCDO represented Appellant at the hearing. At the outset of the hearing, she told the court that "[Appellant had] already been taken back to the jail." She said that she "would like to opt-in on [Mathews's] motions," and she then "re-request[ed]" the one-week continuance that Francis had moved for on Friday, noting that she was unfamiliar with Appellant's case. The court summarily denied the continuance and began to hear argument from Mathews's counsel regarding the motions she had filed.

The court then paused to confirm that Heidari waived Appellant's presence at the hearing. Heidari said that she believed it was in Appellant's best interest to join Mathews's motions and

13

confirmed that she waived Appellant's presence. The trial court then heard Mathews's and the State's legal arguments on the five motions; Heidari did not offer any arguments, and no evidence was presented. The trial court took the motions under advisement and later denied them all; none of those rulings is challenged in this appeal.

When the trial began the following morning, Appellant was represented by Leslie Cardin, another MCDO lawyer. Before jury selection began, Cardin told the court that she was unprepared to select a jury for Appellant and requested a one-day continuance so that Francis could do so. Appellant then addressed the court, saying that he did not feel comfortable having Cardin select the jury. Appellant asked the court, "[W]ill you please let Dennis Francis come sit with me when he comes back?" The court agreed to delay jury selection for one day, and Francis then represented Appellant at trial with the assistance of Heidari.

(b) Appellant now contends that his absence during the pretrial motions hearing violated his right under the Georgia

14

Constitution to be present during the criminal proceedings against him. This Court has long recognized that a criminal defendant has a state constitutional right to be present during all critical stages of the proceedings against him. See *Brewner v. State*, 302 Ga. 6, 9-10 (804 SE2d 94) (2017). See generally *Kesterson v. Jarrett*, 291 Ga. 380, 384-385 (728 SE2d 557) (2012) (discussing the history and sources of this right). We have defined a "critical stage" of a criminal proceeding as one in which "'the defendant's rights may be lost, defenses waived, privileges claimed or waived, or one in which the outcome of the case is substantially affected in some other way.'" *Brewner*, 302 Ga. at 10 (citation omitted). See also *Campbell v. State*, 292 Ga. 766, 770 (740 SE2d 115) (2013) (explaining that the right to be present exists where "a fair and just hearing would be thwarted by the defendant's absence" (citation and punctuation omitted)). If not waived by the defendant, a direct violation of the right to be present is presumed prejudicial and requires a new trial. See *Brewner*, 302 Ga. at 9.

(c) The hearing at issue was a hastily called, last-minute

pretrial motions hearing intended to address the five motions filed by Appellant's co-defendant earlier that day. Appellant complains that he was absent when Heidari joined those motions on his behalf and when the trial court heard arguments regarding the motions. But that aspect of the hearing — that is, the announced purpose of the hearing — involved only legal arguments to which Appellant would have made no meaningful contribution; indeed, at the motion for new trial hearing, Appellant testified that he knew nothing about the legal substance of the motions that were argued. The discussion of the motions in his absence therefore did not violate his constitutional right to be present. See *Brewner*, 302 Ga. at 10 ("[P]re-trial hearings and bench conferences pertaining to purely legal issues, such as the admissibility of evidence or jury instructions, ordinarily do not implicate the right to be present."); *Campbell*, 292 Ga. at 770 ("[T]he pre-trial discussion of legal motions was not a critical stage of trial requiring [the defendant's] presence to ensure a fair hearing."). See also *Heywood v. State*, 292 Ga. 771, 774 (743 SE2d 12) (2013) (explaining that a defendant's presence is not

required at bench conferences consisting of "'essentially legal argument about which the defendant presumably has no knowledge,'" as such presence "'would be useless, or the benefit but a shadow'" (citations omitted)).

(d) Appellant argues at greater length about his absence from the brief portion of the Monday hearing when Heidari re-requested (and the trial court summarily denied) the one-week continuance that Francis had requested (and the trial court denied) at the Friday hearing. Appellant cites no case, however, in which a defendant's absence from a proceeding discussing a continuance has been held to violate his constitutional right to be present. We acknowledge the possibility that a proceeding called to consider a motion for a continuance that would affect a defendant's substantial rights, or at which evidence is presented of which the defendant has knowledge, could be one for which the defendant must be present. But in general, the right to be present does not attach to proceedings involving "logistical and procedural matters." *Heywood*, 292 Ga. at 774. See also *Thomas v. State*, 300 Ga. App. 265, 266 (684 SE2d 391)

17

(2009) ("[A] court's refusal to continue a trial is not necessarily an event that is material to a case for the purposes of determining whether defendant was absent for a critical stage of the proceedings, i.e., one that materially affected his case."). The continuance request at issue was merely a perfunctory reiteration, made during a hearing called on short notice to discuss unrelated motions, of a request for a continuance of just one week made on the previous business day at a proceeding that the defendant attended and as to which he expressed no opinion.[4] Under these circumstances,

---

[4] Appellant tries to magnify the importance of the hearing and his absence from it by asserting that had he been there, he could have explained to the trial court that a continuance was necessary so that Demps, his original attorney, could represent him at trial. But *Demps's* continuing to represent Appellant was not the subject of Francis's continuance request or of Heidari's re-request, both of which sought only to accommodate *Francis's* trip out of town. Appellant was present at the Friday hearing when Francis told the trial court that Demps would not be able to try the case, and Appellant expressed no objection to Francis's representing him at his trial. And when Cardin appeared for Appellant at jury selection on Tuesday morning and asked the court to delay the trial for one day, he chimed in to tell the court that he wanted to wait for *Francis* to return from his trip to represent Appellant, not that he wanted to wait for some unknown period of time for *Demps* to return from medical leave to try the case. The court then agreed to postpone the trial for a day to allow Francis to return.

The hearing Appellant missed was not about a continuance motion, and Appellant could not have meaningfully contributed to the continuance re-request that his counsel briefly interjected into that proceeding. He cannot

18

Appellant's absence from this snippet of the hearing did not violate his right to be present.

3. Appellant also contends that Heidari provided ineffective assistance of counsel when she waived his presence at the pretrial motions hearing just discussed at length. When an alleged violation of the Georgia constitutional right to be present is raised not directly but rather as a claim of ineffective assistance of counsel, the defendant must show both that his lawyer acted deficiently in not asserting his right and that this deficiency caused actual prejudice to the outcome of his trial. See *Peterson v. State*, 284 Ga. 275, 276, 280 (663 SE2d 164) (2008). See also *Strickland v. Washington*, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). For the reasons discussed in Division 2, Appellant has failed to show that he had a right to be present at the motions hearing which his counsel Heidari could have successfully asserted on his behalf; he also has not shown that her waiver of his presence caused him any prejudice

---

convert that proceeding into a critical stage retroactively by asserting (dubiously) that had he been there, he would have sought to raise an entirely different continuance request.

19

at all. His ineffective-assistance claim is therefore meritless.

4. Finally, citing cases such as *Bullcoming v. New Mexico*, 564 U.S. 647 (131 SCt 2705, 180 LE2d 610) (2011), Appellant contends that his right to confrontation under the Sixth Amendment to the United States Constitution was violated when the trial court allowed two "surrogate" expert witnesses to testify for the State. We conclude that any such error was harmless.

At trial, a GBI serologist testified, over Appellant's objection, about the results of a lab test that had been conducted by another GBI scientist who was not available to testify. The serologist testified that the results of the test indicated the presence of blood on the swabbings collected from the blood trail found at the crime scene. Later during the trial, a GBI biologist testified, again over Appellant's objection, about the CODIS results that preliminarily matched the blood to Appellant, which had been reviewed by another GBI scientist who was not available to testify. The State did not admit any lab reports through either of the expert witnesses.

We need not decide whether the admission of this testimony

violated the Confrontation Clause, because the State also presented testimony from the lead detective that Appellant ultimately admitted during his police interview that he had been shot at the crime scene, although he claimed that he was merely a bystander. And the State also presented expert testimony from James Sebestyen, a GBI forensic biologist who testified that he had performed an analysis to confirm that the DNA from the crime scene blood trail matched the DNA found in Appellant's buccal swab. All of this testimony was presented without objection, and it is not challenged on appeal. It rendered unimportant the disputed testimony about whether the substance on the swabbings was blood and whether CODIS had made a preliminary match of the blood DNA to Appellant. As a result, even if the admission of that disputed testimony was erroneous, it was harmless beyond a reasonable doubt. See, e.g., *McCord v. State*, 305 Ga. 318, 324 (825 SE2d 122) (2019).

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 3, 2019.

Murder. Fulton Superior Court. Before Judge Campbell.

*Brown & Gill, Angela B. Dillon*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Rodney H. Atreopersaud, Assistant Attorneys General*, for appellee.