S16A1034. BAILEY v. THE STATE.

(792 SE2d 363)

HINES, Presiding Justice.

Garrett Lee Bailey appeals his convictions for malice murder, cruelty to children in the first degree, and making false statements to law enforcement officers in connection with the death of his girlfriend's sixteen-month-old son, James Lusher. He challenges the admission of certain testimony at trial and the sufficiency of the evidence of his guilt. Finding the challenges to be unavailing, we affirm.[1]

1. Bailey contends that the evidence was insufficient to prove each count of the indictment beyond a reasonable doubt, and that the State presented only circumstantial evidence that did not exclude all reasonable hypotheses except that of his guilt;[2] therefore, the trial court erred in denying his motion for directed verdicts of acquittal. However, that is not the case.

> When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence. [Cits.]

*Harper v. State*, 298 Ga. 158 (780 SE2d 308) (2015), quoting *Mickens*

---

[1] The crimes occurred on or before July 21, 2006. On May 16, 2007, a Wayne County grand jury returned an indictment against Bailey and the victim's mother, Andria Oder f/k/a Andria Lusher, charging them with malice murder, felony murder while in the commission of cruelty to children, cruelty to children, and making false statements to law enforcement officers. Bailey was tried before a jury in November 2009, which trial ended in a mistrial due to the improper introduction of character evidence. Bailey was then tried before a jury February 1-4, 2010, and found guilty of all charges. By judgments signed February 4, 2010 and filed February 8, 2010, he was sentenced to life in prison for malice murder, a consecutive term of 20 years in prison for cruelty to children in the first degree, and a term of five years in prison for making false statements to law enforcement officers, to be served consecutively to the other two sentences. The felony murder conviction stood vacated by operation of law, which was confirmed by a judgment signed on July 23, 2010, and filed July 26, 2010, nunc pro tunc to February 4, 2010. A motion for new trial was filed on February 16, 2010, and the motion was withdrawn on April 25, 2012. A notice of appeal to the Court of Appeals was filed on May 14, 2012, and the appeal was transferred to this Court on November 4, 2015. The case was docketed to this Court's April 2016 term, and the appeal was submitted for decision on the briefs.

[2] See former OCGA § 24-4-6.

*v. State*, 277 Ga. 627, 627-628 (593 SE2d 350) (2004). What is more,

> [q]uestions as to the reasonableness of hypotheses are gen-
> erally to be decided by the jury which heard the evidence and
> where the jury is authorized to find that the evidence,
> though circumstantial, was sufficient to exclude every rea-
> sonable hypothesis save that of guilt, that finding will not be
> disturbed unless the verdict of guilty is insupportable as a
> matter of law.

*Mathis v. State*, 293 Ga. 35, 37 (1) (743 SE2d 393) (2013), quoting
*Rogers v. State*, 290 Ga. 18, 23 (4) (717 SE2d 629) (2011).

The evidence construed in favor of the verdicts showed the following. On July 21, 2006, sixteen-month-old James Lusher was taken to a local hospital emergency room by his mother, Andria Oder ("Oder") and her boyfriend, Bailey, from Oder's apartment in Wayne County. The baby was in critical condition, was unresponsive, had labored breathing, had bruising on his forehead, and was posturing, which was indicative of a neurological deficit. A tube was placed down the baby's throat to provide an airway, and he was flown to a medical center in Savannah, where more advanced care was available. Doctors there determined that the child had suffered a massive head injury, exhibited multiple bruises, and had retinal hemorrhages, indicating that the baby had been the victim of an inflicted traumatic brain injury or an acceleration/deceleration injury, often referred to as Shaken Baby Syndrome; the child was basically brain-dead upon arrival at the medical center. The medical center physician who attended to the baby recommended a full investigation of the matter by police and the Georgia Department of Human Services, Family and Children Services ("DFCS") because of the nature of the injuries and the fact that they were not consistent with the version of events given to the doctor by Oder. The child was pronounced dead on July 23, 2006.

When the police began their investigation, both Oder and Bailey stated that they were present when the baby's injury occurred. They told investigators that the child fell off a children's slide and hit his head on the concrete, but he appeared fine immediately following the fall and did not start to show symptoms until later. Bailey executed a written statement in which he claimed that he came to Oder's home the evening before the baby's fatal injury, ate supper, watched television, and was in bed by 10:00 p.m.; that upon awakening the next morning, Oder cooked breakfast for him, and he and the baby watched television; that the baby "played around all morning, getting into things like he usually does"; that when they were outside in the

back yard around noon the baby fell off the slide and "he landed head-first on the concrete"; that he and Oder picked up the baby, and the baby "had no bleeding problems and he rarely cried about it"; that the baby "was always tough"; that they all then went out to eat at a restaurant, and the baby "was all good pointing at stuff and he ate all his food like he always does"; that they were back home around 1:15 p.m. and continued to watch television; that Oder left about 1:30 p.m. to go to work; that the baby went to sleep about 2:00 p.m. and slept until about 3:00 p.m.; that the baby awoke and Bailey dressed him and the two went to the park and played; that the baby "acted normal at the park"; that Bailey "swang him, but [they] both were sweating so [they] left around 3:30 p.m. and went back home"; that Oder called him several times that day because she "always checks in with [him] when he babysit[s] and she's not there"; that Oder telephoned about 4:00 p.m., saying she would be home around 4:30 p.m. to 4:45 p.m. and that they were going to go for a ride on a friend's boat; that Bailey put swimming trunks and a clean shirt on the baby, and the two waited for Oder to get home, which she did about 4:45 p. m.; that around 5:00 p.m., the baby "threw up, and it was like he had fainted"; that the baby's "throw-up was pink, [Bailey guessed] from the fruit punch [the baby] drank at lunch"; that consequently, he and Oder "rushed him to the ER and they took over."

Oder's initial written statement to police echoed much of Bailey's statement, including that around noon, she and Bailey went outside to smoke, and that "the baby stood up on his slide as always," and "lost his balance and fell onto the concrete, hitting his head"; that she "ran to him and picked him up"; and that "he cried less than a minute and got back down — continuing to play." Oder added that a few weeks prior, the baby "pushed a chair up to the counter and fell off onto the floor and hit the same place on his head."

Approximately a week after the baby's fatal injury, Oder and Bailey, using a doll, performed for police what they claimed was a reenactment of the baby's alleged fall from the slide. They then both executed additional written statements. Bailey stated, in relevant part, that he saw the baby after he fell from the kitchen counter and "he was crying and he was bruised up worse than he was Friday from the slide fall"; that the baby "never shedded [sic] any blood from his outer body but [Oder] had called a nurse and was told to watch him closely and she did for the rest of the day," but that "Friday, he acted fine for the rest of the day"; that Bailey "was not around for any other injuries, but [he] just saw the results from them"; that most of the baby's injuries happened while Bailey was at work but that he had seen the baby "fall on things also"; and that the baby "had a very bad

asthma problem as well." Oder's second written statement to police catalogued the baby's injuries:

> Where he fell off his slide, he hit his elbow and head around the ear area. Earlier that day he tripped on the asphalt and scraped his knee. Earlier that week he had tripped in the dining room and hit his chin on the tile. Thursday me and my mom took him swimming, and his bathing suit, more like a body suit with foam on it, irritated his chin. Sometime last week he got to running and fell into the table and hit the top of his head. A couple of weeks ago he climbed up on the counter top, pushed a chair up to it, and fell off, hitting the trash can and the tile floor on the same side he fell off the slide and hit. Also the back of his head had a knot on it.

She added that when she returned home from work on the day of the fatal incident, she greeted the baby and kissed him, that the baby was in his chair drinking juice and watching television, that he "spit up a little," and then he "really started vomiting a lot," and "his eyes were rolling back and he got stiff," so she and Bailey "rushed him to the hospital."

Oder later admitted to lying to the police and said that she was not present at the time of the injuries that cost the baby his life.[3] She related that she had gone into work that morning and left the baby in Bailey's care; she was with Bailey and the baby at lunch that afternoon and ran into an old friend and "showed off" the baby to him;[4] after lunch, Oder returned to work until around 5:00 p.m.; when she returned home, Bailey and the baby were not there; she called Bailey; Bailey told her he was taking the baby to the hospital because the baby "wasn't breathing right"; Oder told Bailey to bring the baby home for a breathing treatment, inasmuch as the baby had asthma; and when they returned, Oder saw the condition the baby was in and rushed him to the hospital. When Oder asked Bailey what happened, Bailey told her the baby had fallen off the slide, and Oder chose to accept the story because she was afraid of being accused of negligence and losing custody of the baby, inasmuch as the baby's paternal grandparents would be upset that something happened to him while he was in Bailey's care. Oder also told police that the baby had received a similar bruise to the head a few weeks earlier (on June 30,

---

[3] Oder pled guilty to making false statements to law enforcement officers and was sentenced to serve five years in prison.

[4] There was no apparent injury to the baby at that time.

2006), while in the sole care of Bailey and that Bailey then told her that the baby had fallen from a counter top. Later that day, the baby was picked up by his paternal grandparents.

On June 15, 2006, the baby's paternal grandmother, Cheryl Mainor, became concerned about the baby because she noticed that he had bruising on the left side of his head; after Oder and Mainor's son broke up, Oder became involved with Bailey in May 2006; prior to Oder becoming involved with Bailey, there were no suspicions of any problems that Oder had with the baby or any unusual bruises or contusions on the baby; the bruises Mainor observed on June 15, 2006, caught her attention because they were massive and in one place, and so she took a series of photographs of them; on June 30, 2006, Mainor observed additional severe bruising on the child and she took photographs of these injuries as well; Mainor also watched the baby on July 19, 2006, and when she took him back to Oder's apartment on July 20, 2006, the day before his fatal injuries, he began to scream and cry.

The medical examiner determined that the cause of the baby's death was multiple blunt-force injuries, and that the manner of death was homicide. He testified that the baby's body showed predominant bruising, a fracture of the skull, retinal hemorrhage, abrasions, and numerous injuries and soft tissue damage underneath the injury sites; there was also evidence of similar injuries in the past; the fatal injuries were caused by "violent motion," consistent with cranio-cerebral trauma or abuse-of-head trauma, sometimes referred to as Shaken Baby Syndrome; in total, there were 21 impact injuries to the baby's body, which could not have been caused by a fall from a children's slide, but instead were the result of a minimum of nine separate impacts; and had the baby sustained the injuries at 11:30 a.m. or noon he would not have been able to go to a restaurant, sit up, eat lunch, and then play for the rest of the afternoon, and not show any signs of the fatal injuries until 5:00 p.m.

The evidence authorized the jury to find Bailey guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, supra. Consequently, the trial court did not err in denying Bailey's motion for directed verdicts of acquittal.

2. Bailey contends that the trial court erred by admitting alleged illegal hearsay that both improperly bolstered the State's primary witness, Oder, and compelled Bailey to address such hearsay on cross-examination, thus altering its scope and direction. He specifically cites as objectionable Oder's statements to police as admitted into evidence and read to the jury by the interviewing police officer, and Mainor's testimony regarding statements Oder made about the

fatal incident. In argument, he also mentions his own statements to police as admitted into evidence and read to the jury by the police officer.

First, as Bailey acknowledges, he cross-examined Mainor about Oder's version of events and Oder's related conduct. In addition, Oder, herself, testified at trial, and he extensively cross-examined her about the truth or falsity of her subject statements to police. Nevertheless, he complains that he was not given the opportunity to address Oder's statements at the time they were placed in evidence before the jury. But, as to the admission into evidence of each of the subject statements related by the police officer, defense counsel affirmatively stated that Bailey had no objection; nor did Bailey object to testimony by Mainor.

> Georgia has long followed the contemporaneous objection rule, which provides that counsel must make a proper objection on the record at the earliest possible time to preserve for review the point of error. In the absence of a contemporaneous objection and ruling thereon at trial, this issue was not properly preserved for appeal.

*Moore v. State*, 295 Ga. 709, 714 (3) (763 SE2d 670) (2014) (citation and punctuation omitted). And, inasmuch as a plain error review would not apply to Bailey's trial in 2010, the allegations regarding the improper admission of evidence are waived in this appeal. *Durham v. State*, 292 Ga. 239, 240 (2) (734 SE2d 377) (2012).

3. Lastly, Bailey contends that the trial court erred in allowing the medical examiner to testify that the manner of the baby's death was homicide, thus improperly testifying as to the ultimate issue in the case. However, Bailey did not object to such testimony; therefore, he did not preserve this issue for review. See Division 2, supra. In any event, the medical examiner's testimony did not speak to the ultimate issue in the case, which was the identity of the person or persons responsible for the fatal abuse of the baby. *McFolley v. State*, 289 Ga. 890, 892 (717 SE2d 199) (2011). It was left to the jury to determine whether Bailey inflicted the mortal injuries, which it did.

*Judgments affirmed. All the Justices concur.*

DECIDED OCTOBER 17, 2016.

*Jonathan P. Lockwood*, for appellant.

*Jacquelyn L. Johnson, District Attorney, Andrew J. Ekonomou, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew Min-soo Youn, Assistant Attorney General*, for appellee.