308 Ga. 784
FINAL COPY

S20A0343.  HOOD v. THE STATE.

WARREN, Justice.

Antione Hood was convicted of felony murder and possession of

a firearm during the commission of a felony in connection with the

shooting death of Candace McGriff.[1]  Hood appeals, contending that

his trial counsel provided ineffective assistance by failing to consult

a certain expert on gunshot and gunpowder residue.  We disagree

and affirm Hood's convictions.

1. Viewed in the light most favorable to the jury's verdicts, the

---

[1] The crimes occurred on February 17, 2015.  Hood was indicted by a DeKalb County grand jury for malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault (Count 3); and possession of a firearm during the commission of a felony (Count 4).  Hood was tried before a jury, and on September 19, 2016, the jury found him guilty of Counts 2, 3, and 4, but not guilty of Count 1.  On October 31, 2016, the trial court sentenced Hood to life in prison without the possibility of parole on Count 2 and a consecutive five-year term for Count 4.  Count 3 was merged with Count 2.  Hood timely filed a motion for new trial, which he amended twice through new counsel.  After holding a hearing, the trial court denied the motion on August 5, 2019.  Hood timely filed a notice of appeal, and the case was docketed in this Court for the term beginning in December 2019 and submitted for a decision on the briefs.

evidence presented at trial showed the following. On February 17, 2015, Hood's girlfriend, McGriff, died in the bedroom of her apartment from a gunshot wound to her chest. Hood was the only other person in the apartment at the time of the shooting. After the shooting, Hood went to a downstairs apartment and yelled to the hospice nurse who lived there that his girlfriend had shot herself. When the nurse entered the bedroom, she saw a handgun on top of the bed and McGriff lying on the floor between the wall and right side of the bed. The nurse could not detect a heartbeat, and she noticed that McGriff's hands and face were cold and that her eyes were already fixated. Hood then called 911 and reported that his girlfriend had shot herself. As two police officers were arriving, Hood was heard saying, "They're going to think that I did this." Hood appeared calm, and when an officer asked for the victim's name, Hood responded that "she shot herself because [Hood] was leaving her."

At trial, one of McGriff's co-workers testified that in January 2015, she saw "marks" on McGriff's neck, and McGriff told her that

Hood made those marks when he held her down during an argument. A forensic death investigator, Linda Gochenouer, who was qualified as an expert, testified that when she arrived at the crime scene, she found no gunshot powder residue (GPR) or stippling[2] on McGriff's hands, the skin around her chest wound, or her loose-weave sweater, and that was inconsistent with the close range of a self-inflicted gunshot wound. After firearms testing determined that the fatal bullet was fired from the 9mm Ruger that was found on the bed, Investigator Gochenouer performed distance testing[3] on the gun and ammunition recovered from the scene. That testing showed that GPR and stippling were present at distances of

---

[2] Investigator Gochenouer testified that GPR is gunshot powder that exits a gun when it is fired, looks like "black soot," and can be seen by the naked eye. She also testified that stippling is "unburned gunshot residue" that looks like "little black dots."

[3] Investigator Gochenouer testified that the purpose of distance testing is "to be able to get a better idea of the range of fire for [a] particular weapon" and "to see the deposit of gunshot residue at the different distances to try to get an idea of when you can no longer visually see" it. She testified that this testing was important because the lack of gunshot residue on McGriff's clothing and skin provided an idea of how far away the gun was from McGriff's body when it was discharged.

three, six, and 12 inches; stippling (but less GPR) was present at 18 inches; only a little stippling was present at 24 inches; and neither GPR nor stippling was present at 30 and 36 inches.

A GBI forensic scientist, Sarah Peppers, testified that she tested samples taken from Hood's hands at about 2:00 p.m. on the day of the shooting for gunshot primer residue (GSR).[4] The test, which requires microscopic analysis, was positive for three particles characteristic of GSR, indicating that within the previous 12 hours, Hood had either discharged a firearm, been in close proximity to a discharged firearm, or come into contact with an item with GSR on it. Peppers also testified that McGriff's hands were not tested due to the GBI's policy not to test the victim of a gunshot wound because it is already known that a gunshot victim was in the presence of a discharging firearm and 75% of gunshot victims test positive for GSR even though they did not handle the weapon.

The Chief Medical Examiner for DeKalb County, Dr. Gerald

---

[4] Peppers testified that GSR is a "sensitive material that is found in the base of the cartridge case" and is expelled when the trigger of a gun is pulled.

Gowitt, testified that the gunshot wound to McGriff's chest caused her death, as well as numerous internal injuries, including the severing of her spinal cord. Dr. Gowitt found no GPR on McGriff's hands, around her fatal wound, or on her sweater. He took swabs of McGriff's hands for GSR and turned them over to the GBI. Dr. Gowitt estimated that, given the length of McGriff's arms and of the gun, she could have pointed the end of the gun barrel at her own chest from a maximum of 20 inches, a distance from which he usually could see GPR from 9mm weapons easily. According to Dr. Gowitt, the gunshot wound that caused McGriff's death had to be fired from a distance greater than two to three feet and thus was inconsistent with a self-inflicted wound.

Hood does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Hood guilty beyond a reasonable

doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Hood argues that trial counsel was constitutionally ineffective for failing to consult a certain expert about GSR and GPR. He contends that expert testimony on these topics could have raised doubts in the minds of jurors about whether McGriff's shooting was self-inflicted.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish

a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

In his amended motion for new trial, Hood claimed, among other things, that his trial counsel rendered constitutionally ineffective assistance by failing to follow up on a recommendation to consult with GSR expert Christopher Robinson. At the hearing on the motion, Robinson testified that he previously had been a firearms examiner for the GBI and the director of the crime lab for the Atlanta Police Department, but that he now ran his own forensic examination company. Robinson testified that he had "no problem" with Investigator Gochenouer's distance testing, but that he believed McGriff's sweater should have been microscopically

examined or chemically tested for GPR, which could have been trapped in the loose weave of McGriff's sweater. According to Robinson, McGriff could have held the gun with the barrel pointing at herself up to 22 inches away, and it would have been possible that GPR would not be visible "because of the weave of the sweater."

Robinson further testified that when he worked for the GBI 11 years earlier, the hands of all gunshot victims were always tested. He opined that the current GBI policy not to test victims' hands is "totally improper" and that suicide cannot be ruled out without such testing. Robinson also testified that GSR would not necessarily be present just from being in the same room as a fired gun and that the presence of two or three GSR particles on a person's hands could indicate transfer contact.

Trial counsel testified that before trial, he consulted with a retired GBI firearms analyst, Kelly Fite, who performed independent distance testing that produced the same results as Investigator Gochenouer's testing. Fite referred counsel to Robinson for clothing and GSR analysis, but counsel never contacted

Robinson. Instead of consulting an expert on GSR or GPR, counsel decided to attack Dr. Gowitt's testimony on cross-examination and emphasize a typographical error in a demonstrative chart used by Investigator Gochenouer. Counsel "did not want [McGriff's] hands tested" for GSR because a negative result "would have been devastating to the [suicide] defense," yet a positive result would not have prevented the State from arguing that most gunshot victims have GSR on their hands, even when they did not shoot themselves. The lack of testing, counsel explained, "was a great burden of proof argument [as to] why there was reasonable doubt."

In its order denying the motion for new trial, the trial court rejected Hood's ineffectiveness claim, concluding that "trial counsel was not ineffective for deciding not to consult with Robinson as an expert witness." As for the GPR issue, the trial court ruled that because there was no additional testing on the sweater, Robinson's statement that GPR may have been trapped in the sweater was only a comment on what "could" have occurred, and was based on a "misconception" that Dr. Gowitt "did not examine the sweater." The

trial court pointed out that Dr. Gowitt did examine the sweater both with his unaided eyes and with a "ten-power magnifying glass"; found no GPR on the sweater or on McGriff's skin; and opined that if GPR were on the sweater, it would also be on her skin. The trial court also noted that Robinson testified that GPR would generally be visible on a victim's body if the gun was fired within 24 inches, and concluded that Robinson's testimony did not logically rebut Dr. Gowitt's conclusion that, based on the absence of GPR, the gun was fired from more than 24 inches away.

As for the GSR issue, the trial court concluded that Robinson's testimony about the unreasonableness of the GBI's blanket policy not to test for GSR on victims' hands was not based on a scientific or mathematical analysis that would undermine the rationale that GSR was found on victims' hands in 75% of cases with no indication of possible suicide, and was based only on personal opinion. The trial court also concluded that Hood's argument that McGriff's sweater and hands should have been tested was inconsistent with trial counsel's strategy to avoid a "very inculpatory" result in the

event of a negative test result, and this argument could not prevail in any event because appellate counsel made no effort to have the sweater tested prior to the hearing on Hood's motion for new trial.

Pretermitting whether trial counsel was constitutionally deficient by failing to consult with Robinson before trial, Hood has failed to carry his burden to show prejudice. Hood argues that Robinson's testimony at the motion for new trial hearing could have disputed four "aspects of the State's case."[5] But even assuming — without deciding — that Hood is correct that Robinson's expert testimony could have rebutted certain aspects of the State's case, Hood has not shown a reasonable probability that the result of the

---

[5] Hood compares trial counsel's performance here to trial counsel's performance in *Jowers v. State*, 260 Ga. 459, 461 (396 SE2d 891) (1990), in which the Court held that the defendant's trial counsel was constitutionally ineffective. In *Jowers*, we concluded that "counsel did not adequately investigate the case," "did not make the adversarial testing process work," and that "[k]ey ingredients of [the defendant's] sole defense found support in the [S]tate's scientific reports," but that "counsel failed to present such evidence to the jury." Id. at 462 (punctuation omitted). We also concluded that trial counsel's failures had a reasonable probability of undermining confidence in the outcome of the case. Here, by contrast, Hood does not allege that trial counsel failed to engage in the adversarial process, cross-examine the State's witnesses based on their reports, or advance arguments to refute the State's case. Compare id. at 460-462.

trial would have been different.

First, Hood contends that Robinson disagreed with the State's expert testimony that the GSR on Hood's hands indicated that Hood had fired a gun rather than that he had GSR on his hands because of incidental transfer. But the State's expert, Peppers, did not testify that the three particles on Hood's hands definitively indicated that Hood fired a gun and did not rule out the possibility of transfer. Rather, Peppers testified that the presence of GSR merely indicates that a person either discharged a firearm, was in close proximity to a discharged firearm, or came into contact with an item with GSR on it, and that the GSR test cannot actually "determine which one of those three [possibilities] is more likely than the other." Thus, Robinson's testimony is actually consistent with the State's expert testimony.

Second, Hood contends that Robinson's testimony "would have sowed doubt" about the State's failure to test McGriff's hands for GSR. But trial counsel contended on cross-examination and in closing argument that the State's failure to perform GSR testing

cast doubt on the State's argument that the wound was not self-inflicted, meaning that the possibility of a self-inflicted gunshot could not be eliminated. Further, on cross-examination, Peppers explained that whether GSR was on a victim's hands was "not really" good evidence of whether a gunshot wound was self-inflicted, thus undercutting Robinson's testimony with respect to the value of obtaining GSR testing.

Third, Hood contends that a self-inflicted gunshot wound could not be ruled out without a GSR test of McGriff's hands and a microscopic and chemical test of her sweater, and that Robinson could have disagreed with the medical examiner's conclusion that McGriff's wound could not have been self-inflicted. But Hood did not offer any GSR testing of McGriff's hands or chemical testing of McGriff's sweater post-trial. As a result, Robinson's testimony about what a GSR test of McGriff's hands or a microscopic and chemical test of her sweater *could* have shown amounts only to speculation.

And fourth, Hood contends that Robinson could have explained

that a self-inflicted gunshot wound was possible given McGriff's arm length, the length of the weapon used, "and the presence of visible particles in the sweater." But that argument is greatly undercut by Robinson's own testimony that he had "no issues" with Investigator Gochenouer's distance testing, which found that GPR and stippling were present at 18 inches and stippling was present at 24 inches, and that he did "not know" if the particles were gunpowder.

In sum, given the strong evidence of Hood's guilt, it is not reasonably probable that the outcome of the trial would have been different even if Robinson had testified at trial. That is because three of the four points from Robinson's testimony that Hood highlights were either already made by trial counsel; consistent with the State's expert testimony; or undercut by Robinson's own testimony. See *Matthews v. State*, 301 Ga. 286, 289 (800 SE2d 533) (2017) (explaining that the trial court did not err in denying the defendant's motion for new trial where the defendant presented an expert at the motion for new trial hearing but the trial court determined that the "expert's testimony did not rebut the testimony"

of the witnesses and expert presented by the State at trial); *Gomez v. State*, 301 Ga. 445, 458 (801 SE2d 847) (2017) (concluding that the defendant could not prove prejudice in his ineffective assistance claim where there was "no reasonable probability that the jury would have found the equivocal testimony of [the experts at the motion for new trial hearing] more persuasive than the trial testimony given by the experts offered by the State" and "the trial court, which watched the new experts testify, gave no indication that it found them credible"). And the fourth point amounts to no more than speculation about the evidence, which is not sufficient to show that there is a reasonable probability that the outcome of the trial would have been different. See *Parker v. State*, 305 Ga. 136, 141 (823 SE2d 313) (2019) (holding that the defendant failed to show prejudice to establish an ineffective assistance claim where an expert witness's testimony at the motion for new trial hearing "contradicted the State's claim" but was unable to establish "a reasonable probability that the expert's testimony would have made a difference [at] trial"); *Howard v. State*, 298 Ga. 396, 399 (782 SE2d

255) (2016) ("Mere speculation about what the evidence would have shown had it actually been obtained does not satisfy the requirement of showing prejudice.").

Accordingly, we cannot conclude that there is a reasonable probability that the result of the trial would have been different had trial counsel consulted Robinson before trial or called him as a witness. See *Richardson-Bethea v. State*, 301 Ga. 859, 865 (804 SE2d 372) (2017) (explaining that the standard is "whether there is a *reasonable probability* that the result of the trial would have been different had trial counsel presented the proffered evidence," not whether an expert's testimony at the motion for new trial hearing "*might* conceivably have created some doubt in the mind of a juror") (emphasis in original). Robinson has failed to carry his burden of proving prejudice, and his claim of ineffective assistance therefore fails.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 18, 2020.

Murder. DeKalb Superior Court. Before Judge Barrie.

*Michael W. Tarleton*, for appellant.

*Sherry Boston, District Attorney, Emily K. Richardson, Deborah D. Wellborn, Zina B. Gumbs, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.