NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 7, 2022

S22A0530.  REED v. STATE.

MCMILLIAN, Justice.

Jaquavious Reed appeals his conviction for murder and other charges in connection with the death of Antwan Curry.[1] On appeal,

---

[1] Curry was killed on March 15, 2010. On June 15, 2010, a Fulton County grand jury indicted Reed and Santron Prickett in connection with Curry's death, charging them jointly with murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault (Count 4); and possession of a firearm during the commission of a felony (Count 5). Prickett was also charged with felony murder predicated on possession of a firearm by a convicted felon (Count 3) and possession of a firearm by a convicted felon (Count 6). Reed and Prickett were tried together before a jury from May 2 to May 10, 2011. Reed was convicted of all counts charged against him and sentenced to life in prison on both Counts 1 and 2. Reed also was sentenced to five years on Count 5, to run consecutive to Count 2, and Reed's conviction for aggravated assault under Count 4 was merged for sentencing purposes into Counts 1 and 2. Prickett was convicted of all charges except murder, and he filed a separate appeal of those convictions in case number S22A0531.

Reed's trial counsel filed a timely motion for new trial on May 13, 2011, and appointed appellate counsel filed an amended motion for new trial on May 16, 2019. Reed's current appellate counsel entered an appearance on February 2, 2021, and filed a second amended motion for new trial on April 6, 2021. The trial court held a joint hearing on Reed's and Prickett's separate motions for new trial from July 21 to 23, 2021, and entered orders denying their motions

Reed asserts that (1) the evidence was insufficient to support his convictions; (2) he was denied due process due to an inordinate delay in the appellate process; (3) he was denied the right to be present at every critical stage of the trial when the trial court conferred with counsel at 26 bench conferences; (4) the Fulton County District Attorney's Office (the "DA's office") should have been disqualified because his attorney of record was employed by the DA's office at the time of trial; (5) he was denied due process when the State failed to preserve a true and correct copy of the full trial transcript including the bench conferences; (6) he was denied the right to effectively confront his accusers when the State failed to turn over exculpatory Crime Stoppers reports in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (83 SCt 1194, 10 LE2d 215) (1963); (7) the trial court committed reversible error by refusing his request for a continuance to allow time to investigate a "surprise witness" presented by the State; (8) he received ineffective assistance of

on October 21, 2021. Reed filed a timely notice of appeal, and the case was docketed to the April 2022 term of this Court and was orally argued on April 21, 2022.

counsel with regard to the bench conferences, the incomplete transcript, and his trial counsel's failure to object to the "presumption of truthfulness" jury charge; and (9) the trial court erred in sentencing him for both murder and felony murder. Although we agree with Reed that the trial court erred in imposing his sentence and we vacate his conviction for felony murder and remand for resentencing, we otherwise affirm for the reasons discussed below.

The evidence presented at trial showed that on March 15, 2010, Curry stopped at an apartment complex in Fulton County and purchased marijuana. Curry subsequently became involved in a physical altercation with Santron Prickett in a parking lot at the complex. Five people who knew Prickett testified at trial that they observed this altercation. One witness testified that he heard Prickett and Curry arguing about the fact that Curry bought the marijuana from someone other than Prickett. Witnesses said the two men "tussled" and Curry appeared to be getting the better of Prickett until Curry was shot in the knee. After he was shot, Curry

3

continued to struggle with Prickett, until Prickett was shot in the hand and ran away.[2] One witness told police that Prickett later told her that, as he ran away, he yelled, "[T]hat n****r shot me . . . [Y]'all kill that p***y n****r."[3]

Three witnesses, who knew Reed, testified that after Prickett left, Reed approached Curry and shot him. Keon Burns testified that Reed took the gun from Prickett and "finished it off" by shooting Curry. Willie Wilson testified that after Prickett ran off, Curry was on his knees in the parking lot when Reed shot Curry at least twice, saying let the "f*****g n***r die." Reed directed that no one should help Curry and then put the gun in the back of his pants and left. Harriet Feggins testified that she was sitting in her car at the complex when she saw Prickett struggling with Curry. After Prickett left, it looked like Curry was trying to get up. She saw Reed approach Curry and "just unload" the gun. She did not know how

---

[2] The evidence surrounding Prickett's involvement in the crimes charged is more fully set out in our opinion in Case No. S22A0531.

[3] Later, this witness, the mother of one of Prickett's children, recanted her statement to police. She testified at trial that everything she told police Prickett had said to her was a lie because she was mad at Prickett at the time.

many times Reed shot Curry, but she heard Reed shout, "P****y n*****r, you can't do nothing," and that he was going to show Curry "how it's done." A fourth witness, Lakeyta Smith, also testified that she saw someone shoot Curry after Prickett fled the scene, but she did not know Reed and she could not pick his photo out of a police lineup. The medical examiner testified that in addition to the gunshot wound to Curry's knee, Curry had gunshot wounds to the chest and shoulder. She said that Curry died from a bullet that entered his shoulder and traveled through his body striking his lung, heart, and liver.

When Reed was arrested about one month after the incident, he told police that he was not there when Curry was shot but instead was at his cousin's apartment in another part of the complex. However, Reed's cousin testified at trial that when she left her apartment about an hour or so before the shooting, Reed was not inside but instead was sitting outside in the complex about a couple of minutes' walk from the scene of the shooting.

The State also called Feggins's cousin as a witness in response

to Feggins's testimony, which, although it implicated Reed, was exculpatory for Prickett. The cousin described an earlier altercation she had with Feggins during which Feggins bit the cousin in the leg, kicked in the cousin's door, and threatened the cousin with a pistol. When asked about Feggins's reputation for truthfulness in the community, Feggins's cousin replied that it depended on the situation.

Reed called five witnesses at trial in his defense. Reed's grandmother testified that he had never been in trouble before. Wilson's daughter, whom Reed dated for almost a year, testified that her father was a "compulsive liar," who did not like Reed. Two of the remaining witnesses were called to rebut Wilson's testimony as to the sequence of events on the day of the crime, and the third, a law student assisting the defense, said that when Reed's trial counsel previously interviewed Feggins's cousin about Feggins's reputation for truthfulness in the community, the cousin replied that Feggins was "a liar."

1. Reed first argues that the evidence was insufficient to

support his convictions.[4] When evaluating the sufficiency of evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (citation and emphasis omitted). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citations omitted).

Reed argues that the evidence against him was insufficient

---

[4] Reed enumerated as error that "'[t]he verdict of the jury is contrary to the evidence and the principles of justice and equity, OCGA § 5-5-20; the verdict is decidedly and strongly against the weight of the evidence, OCGA § 5-5-21; and a new trial should be granted for other grounds not otherwise provided for in statute, according to the provisions of the common law and practice of the courts, OCGA § 5-5-25." "However, our review of a trial court's denial on the general grounds is limited to review of the sufficiency of the evidence under *Jackson*." *Poole v. State*, 312 Ga. 515, 520 n.3 (863 SE2d 93) (2021).

because it rested only on the testimony of Wilson and Feggins, neither of whom made an initial statement to police once investigators arrived on the scene. Moreover, the evidence showed that Wilson was upset that Reed was dating his daughter and the State sought to impeach Feggins's testimony at trial, even though Feggins was a witness for the State.[5]

However, Reed's arguments merely attack the credibility of Wilson and Feggins, and it is well settled that "it is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Graham v. State*, 301 Ga. 675, 677 (1) (804 SE2d 113) (2017) (citation and punctuation omitted). Moreover, Reed's arguments fail to take into account the remainder of the evidence presented by the State at trial, including, but not limited to, Burns's testimony that he saw Reed take the gun from Prickett and shoot Curry. See OCGA § 24-14-8 ("The testimony of a single witness is

---

[5] The State also argued in closing that Feggins could not be believed.

8

generally sufficient to establish a fact.).

We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Reed was guilty of the crimes for which he was convicted.

2. Reed also contends that he was denied due process because there was an inordinate delay in the appellate process, thereby violating his right to a speedy appeal.

"This Court has recognized that substantial delays experienced during the criminal appellate process implicate due process rights." *Chatman v. Mancill*, 280 Ga. 253, 256 (2) (a) (626 SE2d 102) (2006). In assessing such claims, this Court considers four factors: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." *Terrell v. State*, 313 Ga. 120, 123 (1) (868 SE2d 764) (2022). Prejudice in this context "is prejudice to the ability of the defendant to assert his arguments on appeal and, should it be established that the appeal was prejudiced, whether the delay prejudiced the defendant's

9

defenses in the event of retrial or resentencing." *Chatman*, 280 Ga. at 260 (2) (e) (appropriate test for analyzing prejudice in this context is "akin to the second prong of *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984): appellate delay is prejudicial when there is a reasonable probability that, but for the delay, the result of the appeal would have been different") (citation and punctuation omitted)). Reed bears the burden of showing the requisite prejudice, and we have "repeatedly [determined] that the failure to make this showing of prejudice in an appellate delay claim is fatal to the claim, even when the other three factors weigh in the appellant's favor." *Terrell*, 313 Ga. at 123 (1) (citation and punctuation omitted).

More than ten years passed between Reed's conviction and sentence in May 2011 and the order denying his motion for new trial in October 2021. Reed asserts that he was prejudiced because, due to this delay, his trial attorney could not remember what occurred before or during trial and none of the trial participants could recall what occurred during the unrecorded bench conferences that took

10

place during the trial, which Reed claims hampered his ability to present his appeal. However, Reed elicited no testimony from his trial counsel or the other trial participants that their memories regarding the bench conferences would have been better if the appeal had occurred earlier. Moreover, Reed has not shown how a better recollection by counsel would have been relevant to, or aided in, his motion for new trial or his appeal, particularly in light of the fact that the trial court was able to make findings about what occurred at the bench conferences from their context in the transcript. Although Reed asserts that the long delay made it difficult to recreate the unrecorded bench conferences, as discussed further in Division 5 below, he has failed to show any prejudice resulting from the lack of transcription.

It is well settled that a bare assertion that a delayed appeal resulting in "loss of recollection, evidence, witnesses, testimony etc.," without specific evidence showing that the delay has prejudiced an appeal, is insufficient to show the requisite prejudice to demonstrate a violation of due process. *Lord v. State*, 304 Ga. 532, 542 (8) (820

11

SE2d 16) (2018) (insufficient to cite delay and assert that the prejudicial effect is obvious). See also *Veal v. State*, 301 Ga. 161, 168 (3) (800 SE2d 325) (2017) ("generalized speculation about the delay's effect on witness memories and evidence is not the kind of 'specific evidence' required to show prejudice in the appellate-delay context" (citation and punctuation omitted)); *Payne v. State*, 289 Ga. 691, 695 (2) (b) (715 SE2d 104) (2011) (general assertions that "witnesses' memories have likely faded and evidence has probably been lost" insufficient to show prejudice arising from 15-year delay in appeal). Accordingly, even if we assume, without deciding, that the other three factors each would weigh in Reed's favor, "his failure to make the requisite showing of prejudice is fatal to his claim of appellate delay." *Dawson v. State*, 308 Ga. 613, 623-24 (4) (842 SE2d 875) (2020).

3. Reed asserts that the trial court improperly denied his right to be present at every critical stage of his trial, when the trial judge conferred with counsel outside Reed's presence during bench conferences at his trial.

It is well settled that "the Georgia Constitution guarantees a criminal defendant the right to be present, and see and hear, all the proceedings which are had against him on the trial before the Court." *Steen v. State*, 312 Ga. 614, 617 (2) (864 SE2d 27) (2021) (citation and punctuation omitted). See also *Zamora v. State*, 291 Ga. 512, 517-18 (7) (b) (731 SE2d 658) (2012). This right "attaches at any stage of a criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure." *Nesby v. State*, 310 Ga. 757, 758 (2) (853 SE2d 631) (2021) (citation and punctuation omitted).

Although the right to be present can extend to bench conferences, it "does not extend to situations where the defendant's presence bears no relation, reasonably substantial, to the fullness of his opportunity to defend against the charge, and thus would be useless, or the benefit but a shadow." *Champ v. State*, 310 Ga. 832, 840 (2) (b) (854 SE2d 706) (2021) (citation and punctuation omitted). "Such situations include bench conferences that deal with questions of law involving essentially legal argument about which the

13

defendant presumably has no knowledge, or with procedural or logistical matters." Id. (citation and punctuation omitted). See also *Heywood v. State*, 292 Ga. 771, 774 (3) (743 SE2d 12) (2013) (defendant's absence from such bench conferences did not violate his right to be present).

> Moreover,
>
> the right to be present belongs to the defendant, and he is free to relinquish it if he so chooses. A defendant may relinquish his right in several ways: if he personally waives the right in court; if his counsel waives the right at his express direction; if his counsel waives the right in open court while he is present; or, as seen most commonly in our case law, if his counsel waives the right and the defendant subsequently acquiesces to that waiver.

*Champ*, 310 Ga. at 841 (2) (c) (citation and punctuation omitted). But see *Hardy v. State*, 306 Ga. 654, 660 (2) (b) (832 SE2d 770) (2019) ("If not waived by the defendant, a direct violation of the right to be present is presumed prejudicial and requires a new trial."). "Acquiescence occurs if a defendant is aware of the proceedings taking place in his absence but remains silent, so long as he had sufficient information concerning the matters occurring outside his

14

presence for his silence to be fairly construed as consent." *Steen*, 312 Ga. at 617 (2) (citation and punctuation omitted.) See also *Champ*, 310 Ga. at 841 (2) (c); *Burney v. State*, 299 Ga. 813, 820 (3) (b) (792 SE2d 354) (2016) (Acquiescence "is a tacit consent to acts or condition" and "implies a knowledge of those things which are acquiesced in."). And "[a] trial court's findings of fact in this regard will be upheld unless clearly erroneous." *Howard v. State*, 307 Ga. 12, 21 (4) (834 SE2d 11) (2019).

In 2019, counsel for Reed and Prickett entered into a stipulation with the State in which they agreed that there were "26 unrecorded bench conferences" (the "Stipulation");[6] the participating trial counsel could not recall the substance of what occurred in those bench conferences; and no amount of time or effort on behalf of the parties would enable those attorneys to recall what

---

[6] Although the parties and the trial court repeatedly reference 26 unrecorded bench conferences, the Stipulation only identifies 25 bench conferences. One of the conferences mentioned in the prior motion to complete the record was omitted from the list of bench conferences in the Stipulation and other later filings. The transcript reflects that most of the omitted 26th conference was held in open court without the jury present.

occurred. Subsequently, the trial court issued an order stating that despite good faith efforts by all parties involved, the record of those bench conferences could not be recreated nor the transcript completed. Reed argues that each of these bench conferences was held outside his presence in violation of his rights under the Georgia Constitution.

Reed's trial counsel was questioned about the bench conferences at the motion for new trial hearing, and she could not recall what was discussed during those conferences. However, she did recall that she had no discussion with Reed before trial regarding his ability to be present at bench conferences because she had not had such a conversation with anyone.[7] Trial counsel also explained that at the time of Reed's trial, it was standard practice for the attorneys to handle the bench conferences while the defendant stayed at the defense table. Trial counsel never talked to Reed about whether he wanted to, or could, object to that practice,

---

[7] Reed's trial counsel testified that Reed's trial was the last trial she ever handled.

nor did she request that the bench conferences be recorded. However, as far as trial counsel could remember, Reed was in the courtroom during the entirety of the proceeding and sat at counsel's table when she went up for bench conferences. She did not know if Reed could hear what was said during the conferences, but if Reed had had any concerns, she would have listened to them, or, if she thought that he had information that would have been helpful to her arguments during those conferences, she would have consulted with him.

Reed testified at the hearing that the only conversation he remembered having with his trial counsel occurred during jury selection when counsel asked him which jurors he would like to strike. Reed said he did not realize the importance of bench conferences and that trial counsel never discussed the issue with him. He said he never went to the bench for those conferences, and he could never hear what was being said.

In the order denying Reed's motion for new trial on this ground, the trial judge stated that he had reviewed the trial transcript,

"specifically in detail the portions in the transcript immediately prior to and immediately after the unrecorded bench conferences," and listened to the testimony at the hearing on the motion for new trial. From that review, the trial court determined that the unrecorded bench conferences "dealt with either logistical/procedural matters or questions of law," which did not violate Reed's right to be present. The trial court further found that Reed's presence at the conferences "would have been useless or the benefit but a shadow" and that Reed had acquiesced in his trial counsel's waiver of his presence at the bench conferences.

Reed does not specifically identify or address each of the individual bench conferences at issue in his appellate brief, nor did he do so in his trial court briefing. However, during oral argument, Reed addressed one bench conference that occurred during voir dire.[8] Otherwise, Reed consistently refers to "the 26 Bench Conferences" collectively and asserts that all of them violated his

---

[8] Reed's appellate brief addresses another bench conference, which took place during closing argument, in the context of a different enumeration of error and that conference will be addressed in Division 4 below.

18

right to be present. From our own review of the bench conferences identified in the Stipulation, it appears that five of the conferences occurred during voir dire and jury selection[9] and the remainder took place over the course of the trial after the jury was sworn. Because Reed's oral argument singled out one bench conference during voir dire, we will address the conferences before the jury was seated separately from the remainder of bench conferences cited in the Stipulation.

(a) Bench Conferences During Voir Dire and Jury Selection

This Court has recognized that "[j]ury selection is a critical stage at which a defendant generally is entitled to be present, including at bench conferences." *Young v. State*, 312 Ga. 71, 79 (9) (860 SE2d 746) (2021), cert. denied, __ U.S. __ (142 SCt 1206, 212 LE2d 215) (2022). Nevertheless, not every bench conference that

[9] We note that during argument before the trial court at the hearing on Reed's motion for new trial, Reed's counsel purported to identify seven bench conferences that took place during voir dire and jury selection, and the trial court found that he identified six such conferences, but it appears from our review that only five of the identified bench conferences took place during that process.

19

occurs during the voir dire process necessarily implicates a defendant's right to be present. Conferences may occur during voir dire that involve legal argument or merely procedural or logistical matters, which do not implicate that right. See *Champ*, 310 Ga. at 840 (2) (b); *Nesby*, 310 Ga. at 759 (2). Moreover, as noted above, a defendant may acquiesce in his trial counsel's waiver of his presence at bench conferences involving jury issues where his counsel makes no objection to his absence and the defendant "remains silent after he or she is made aware of the proceedings occurring in his or her absence." *Murphy v. State*, 299 Ga. 238, 241 (2) (787 SE2d 721) (2016).

The transcript reflects that voir dire in this case was conducted over two days. On the first day, the trial court asked the venire general questions and considered any claims of hardship. The second day consisted of individualized voir dire questions, motions to strike jurors for cause, and jury selection.

(i) *General Voir Dire and Hardship Dismissals*: Four of the five bench conferences cited by Reed during voir dire occurred on the

first day. In addition to its overall findings regarding the bench conferences in this case, the trial court determined from its review of the trial transcript from that day that "the prospective [jurors'] testimony regarding the hardships and this Court's decision regarding dismissal of a juror due to hardships were made in open court in front of [Reed] and not during the unrecorded bench conferences."

The transcript reflects that the general voir dire questions were posed in open court, including the trial court's question asking whether any potential jurors had a hardship affecting their jury service.[10] A number of potential jurors raised their hands when the trial court asked the question, and the court questioned each of them about their claims. All but one of these jurors were questioned in Reed's presence in open court. The remaining juror stated in open

---

[10] Before asking whether any of the prospective jurors had any hardship that could affect his or her ability to serve on the jury, and in Reed's presence, the trial court provided a detailed explanation of the nature of the hardships that could lead to release from jury service and distinguished those hardships from "inconvenience hardships," which he said would not qualify for a dismissal. This explanation outlined the various factors the trial court would consider in determining whether to dismiss a juror on the basis of hardship.

court that she had a medical hardship but preferred to speak to the judge privately. She was later questioned about her claimed hardship at the bench and that questioning was transcribed for the record. The transcript reflects that after the trial judge questioned the juror about her medical condition, he told her that she would be released.[11]

A short time after that bench conference, the trial judge informed the venire that he would be releasing them for the day but first wanted to instruct them regarding the next day's procedures. The trial court then stated that if the bailiff gave any member of the venire "a slip," that meant the judge had granted his or her hardship request, and those members did not have to return the next day. The trial judge thus released those prospective jurors from further jury service and continued his instructions for the remaining members of the venire.

---

[11] At oral argument, Reed's counsel agreed that the trial court's decision to release that juror was made in open court. We note, however, that the transcript does not clearly reflect whether the trial court went back on the record for that announcement.

Reed's counsel asserted at oral argument that, contrary to the trial court's finding as to all the bench conferences, the conference concerning the hardship that the juror declined to explain in open court implicated his right to be present because the potential juror was questioned outside his presence.[12] See *Champ*, 310 Ga. at 840 (2) (b) (appellant had right to be present at bench conferences involving or related to direct discussions between the trial court and prospective jurors and decisions to remove prospective jurors). Under these circumstances, we conclude that, even assuming that all four of the bench conferences during this portion of voir dire implicated Reed's right to be present, Reed's trial counsel waived Reed's presence, and Reed acquiesced in that waiver. There is no dispute that Reed was in the courtroom throughout the voir dire process, and aware of each of the bench conferences, and he raised no objection to this procedure. The general voir dire questions and the questioning of all but one of the jurors asserting hardships were

[12] However, Reed has raised no such particularized argument in briefing or at oral argument addressing or contesting the trial court's finding as to the nature of any of the other bench conferences that day.

23

made in Reed's presence, allowing him to hear the basis on which those jurors sought to be excused from jury service. Reed was also aware that the remaining juror was seeking to be excused based on a medical condition, and Reed was in the courtroom when she was called to the bench to discuss her condition, but neither  he nor his counsel objected to the questioning of that juror outside Reed's presence. Shortly thereafter, the trial court dismissed the jurors with hardships in open court and there is no contention that Reed could not observe the procedure of the bailiff handing the dismissed jurors their paperwork or that he could not otherwise identify those jurors who were excused on this basis. Neither Reed nor his counsel objected in court to the dismissal of any of those jurors.

Accordingly, we conclude that Reed is not entitled to a new trial based on the bench conferences during this portion of voir dire. See *Young*, 312 Ga. at 79 (10); *Murphy*, 299 Ga. at 241-42 (2).

(ii) *Individual Voir Dire and Jury Selection*: Only one disputed bench conference occurred on the second day of voir dire. The transcript reflects that the potential jurors were individually

24

questioned in Reed's presence, and the trial court found that "counsel's arguments to strike potential jurors for cause, and this Court's ruling regarding those strikes, were made at the conclusion of the voir dire process[,] . . . in open court where [Reed] could hear all of the arguments and rulings." Reed does not contest the trial court's finding that these matters occurred in open court and in his presence.

After this portion of voir dire concluded, the transcript shows that the trial court allowed Reed and Prickett to move their chairs to better participate in the jury selection process with their counsel, and Reed testified that his trial counsel consulted him in the exercise of his peremptory strikes. The parties then silently exercised their peremptory strikes by passing the jury list back and forth. The one bench conference Reed identified from this phase of voir dire occurred immediately after this process when the trial court called counsel to the bench. After this conference, when the proceedings went back on the record, the trial court asked counsel whether they had any motions, and they stated they did not. The

25

jury was then announced and seated.

Reed has made no effort to contest the trial court's finding, based on the court's review of the transcript, that this conference involved legal, procedural, or logistical matters, as to which his presence was not required. The fact that the bench conference was not transcribed does not relieve him of this burden of presenting evidence that "the bench conference[] about which he complains [was] the sort that implicated his right to be present. Mere speculation as to what may have been discussed at the conference[] cannot serve as the basis for the grant of a new trial." *Nesby*, 310 Ga. at 759 (2) (citation and punctuation omitted). See also *Reeves v. State*, 309 Ga. 645, 648 (2) (847 SE2d 551) (2020); *Daughtie v. State*, 297 Ga. 261, 267 (5) (773 SE2d 263) (2015).

Thus, Reed is not entitled to a new trial based on this bench conference.

(b) Bench Conferences During Trial

The 20 remaining bench conferences identified in the Stipulation occurred over the course of the trial. As noted above, the

trial court found that all of these conferences "dealt with either logistical/procedural matters or questions of law," which did not violate Reed's right to be present. Reed has made no effort to address these conferences individually to contest the trial court's finding or to show that a particular conference during trial implicated his right to be present, and based on our review, we conclude that the trial court's findings are supported by the record. See *Nesby*, 310 Ga. at 759 (2); *Heywood*, 292 Ga. at 774 (3); *Reeves*, 309 Ga. at 648 (2); *Daughtie*, 297 Ga. at 267 (5).

Accordingly, we conclude that Reed is not entitled to a new trial based on these untranscribed bench conferences.

4. Reed next contends that the DA's office should have been disqualified from prosecuting him because his attorney of record was working for the DA's office at the time of his trial, presenting a conflict of interest. A conflict of interest is one generally recognized ground for disqualification of a prosecuting attorney, and such a conflict "has been held to arise where the prosecutor previously has represented the defendant with respect to the offense charged, or

27

has consulted with the defendant in a professional capacity with regard thereto." *Williams v. State*, 258 Ga. 305, 314 (2) (B) (369 SE2d 232) (1988) (noting two generally recognized grounds for disqualification of prosecutor: conflict of interest and "forensic misconduct" (citation and punctuation omitted)).

At the hearing on Reed's motion for new trial, Edward Chase, formerly employed as an attorney by the Fulton County Office of the Public Defender (the "PD's office"), testified that he was appointed to represent Reed, and the record reflects that, in that capacity, Chase filed an entry of appearance in Reed's case on July 2, 2010, along with consolidated pretrial motions, discovery requests and notices, and a motion to set bond. Chase also represented Reed at his arraignment on July 2 and at a bond hearing on July 16. In October 2010, Reed's trial was specially set for May 2, 2011.[13] Subsequently, in December 2010, Chase interviewed for

---

[13] Reed does not assert that Chase engaged in any further action on his behalf. In fact, the record contains no indication that counsel for any party or the trial court took any action in the case from October 10, 2010, when the trial was specially set, to March 17, 2011, when the State served a subpoena on a witness.

employment with the DA's office and started work with that office on February 2, 2011. However, Chase never filed a formal motion to withdraw as Reed's counsel; instead, as was the practice at the time, another attorney in the PD's office, who became Reed's trial counsel, took over the cases previously handled by Chase.

Chase testified at the hearing on the motion for new trial that after he left the PD's office, Reed's trial counsel immediately began handling Reed's case.[14] Once Chase began his employment with the DA, no one there ever asked him, and, as a matter of intention, he never talked to anyone there, about Reed's case or any of his other cases with the PD's office. Chase said he had no regular contact with the prosecutor in Reed's case as he was assigned to a different division, and the judge to whose courtroom Chase was assigned was not the judge presiding over Reed's trial.

However, pretermitting whether Chase's prior employment as

---

[14] Although Reed's trial counsel never filed a formal entry of appearance or notice of substitution of counsel, the State referred to her as Reed's counsel of record in a discovery demand filed April 11, 2011, and her first court filing on Reed's behalf was on April 22, 2011, about ten days before trial.

29

Reed's counsel presented a conflict of interest disqualifying the DA's office from prosecuting Reed, we conclude that Reed has waived this issue for appeal because he did not raise it in a timely manner. Although we have not considered when a motion to disqualify a prosecutor based on an alleged conflict of interest should be asserted, we have held, in other contexts, that such challenges must be raised promptly after the defendant learns of a potentially disqualifying matter. See *Battle v. State*, 298 Ga. 661, 666 (2) (a) (784 SE2d 381) (2016) (where defendant learned of the grounds for potential disqualification of the trial judge before trial, and failed to raise issue until after trial, "he could not do so and still preserve the disqualification issue for review in the appellate courts.") (citation omitted)); *Gary v. State*, 260 Ga. 38, 42 (7) (389 SE2d 218) (1990) (failure to raise motion for recusal in timely manner precludes appellate review); *Hudson v. State*, 250 Ga. 479, 481 (1) (299 SE2d 531) (1983) (where defendant asserts that his appointed trial counsel should have been disqualified based on his contemporaneous service as probate judge and state court solicitor,

"the objection to counsel must be made without delay, at the first opportunity after the accused learns of the grounds for disqualification."), questioned on other grounds, *Bass v. State*, 285 Ga. 89, 94 (674 SE2d 255) (2009).

Here, Reed's trial attorney was aware of Chase's employment with the DA's office several months before trial, as she worked for the PD's office and took over Chase's cases when he left to take his new job. Yet, she failed to assert a conflict of interest nor did she seek to disqualify the DA's office; instead, Reed first raised the issue in a post-trial motion for new trial.[15] We conclude this delay

---

[15] Reed asserts in his appellate brief that "[i]t appears that all the parties, except [him] were fully aware of this conflict and that no one, neither the [DA], [his] new trial attorney, nor the Trial Court attempted to address this conflict, which was in violation of [his] rights." However, absent a demonstration of ineffectiveness, Reed is "deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." *New York v. Hill*, 528 U.S. 110, 115 (II) (120 SCt 659, 145 LE2d 560) (2000) (citations and punctuation omitted). See *Jackson v. Faver*, 210 Ga. 58, 58-59 (4) (77 SE2d 728) (1953) ("[K]nowledge acquired by an attorney in the course of his employment, and pertinent and relevant to the subject matter of his employment, is imputable to his client."). "Thus, decisions by counsel are generally given effect as to what arguments to pursue." *Hill*, 528 U.S. at 115 (II). Despite the contention that his trial attorney was aware, but failed to inform him or raise the issue of this alleged conflict of interest, Reed does not assert a claim for ineffective assistance of counsel on this ground.

precludes our review of the matter on appeal.

5. Reed further contends that he was denied due process when the State failed to preserve a true and correct copy of the trial transcript, in particular, any transcription of the bench conferences discussed in Division 3, above, and thus denied him the ability to properly appeal his convictions.

Georgia law requires that a transcript be prepared of all evidence and proceedings in felony cases. See OCGA § 5-6-41. However, Reed acknowledges that the missing portions of the transcript alone do not entitle him to a new trial; rather he must show that he was harmed as a result of the incomplete transcription. See *Bradford v. State*, 299 Ga. 880, 882 (4) (a) (792 SE2d 684) (2016) (failure to record bench conferences "does not constitute reversible error absent a showing of prejudice to the defendant").

Reed has failed to make that showing. Although Reed claims that the transcription of the bench conferences would have allowed him to show that his absence from those conferences was reversible error, the trial court was able to determine the subject of those

32

conferences from their context within the transcript, and we have concluded that those findings are supported by the record. Also, although Reed points to one bench conference that occurred during the prosecution's closing argument, which he contends "was vital to [Reed's] ability to raise error," he provides no explanation as to why or how this bench conference was vital to his appeal. That bench conference took place after Prickett's counsel objected when the prosecutor referred to a portion of a recorded jailhouse conversation between Prickett and another witness that had been redacted and not published to the jury during trial. Although the bench conference was not transcribed, Prickett's counsel was allowed to put his objection on the record at the conclusion of the State's closing argument, in open court and in Reed's presence. Reed raised no objection in the trial court and no issue on appeal arising from this bench conference. [16] Nor has Reed offered any explanation as to how the prosecutor's reference to matters outside the evidence involving

---

[16] We note that, in his own appeal, Prickett relied on the existing record to assert error in the trial court's response to his counsel's objection.

his co-defendant would give him a ground for appeal that he is now prevented from asserting.

Under these circumstances, we see no merit to Reed's argument on this ground as he has failed to show any prejudice to his ability to prepare his appeal from the failure to transcribe that or any other bench conference.

6. Reed also asserts that he was denied the right to effectively confront his accusers when the State failed to turn over exculpatory evidence contained in Crime Stoppers reports in violation of *Brady*. To prevail on a *Brady* claim, a defendant must establish four factors:

> (1) [t]he State, including any part of the prosecution team, possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed to the defense.

*McCray v. State*, 301 Ga. 241, 246 (2) (c) (799 SE2d 206) (2017) (citation omitted). Reed bears the burden of proof on each of these elements. See *Harris v. State*, 313 Ga. 653, 664 (5) (872 SE2d 732)

34

(2022).

In April 2019, Reed's intermediate appellate counsel filed a post-trial *Brady* motion to obtain exculpatory evidence, including evidence of any payments by Crime Stoppers Atlanta to three of the State's witnesses, Burns, Wilson, and Smith. The evidence at a subsequent hearing on that motion showed the following. Crime Stoppers is a private entity, separate from the DA's office and the Atlanta Police Department (the "APD"), and is governed by a group of business and community leaders, not the APD. Tips to the Crime Stoppers phone line are handled anonymously and identified by a number. Following a "meaningful prosecution," the tip goes to an independent board that determines its value. The APD never knows whether a tipster received money for a tip, and the evidence was unclear as to whether any records exist showing payments to individuals by name, rather than by tip number.

Crime Stoppers offered a reward for information on Curry's murder, and David Quinn, the lead detective on the case, announced this reward on the evening news the night of the crime. Reed asserts

that the three witnesses wanted the Crime Stoppers money. When cross-examined at trial, Wilson denied receiving any payment from Crime Stoppers but, on cross-examination, admitted asking about whether there was any money for him. Burns admitted asking Detective Quinn for the Crime Stoppers money, but the detective told him that APD had nothing to do with it. Smith was not questioned about Crime Stoppers. Reed has pointed to no evidence showing that either the APD or the DA's office had any record of payments to those witnesses.

Because Reed failed to present any evidence that the State was in possession of, and failed to disclose, exculpatory information from Crime Stoppers, his claim that the trial court violated his rights under *Brady* and the Sixth Amendment fails. See *Harris*, 313 Ga. at 664-65 (5) ("*Brady* requires information to be revealed only when it is possessed by the prosecutor or anyone over whom the prosecutor has authority." (citation and punctuation omitted)); *State v. Hill*, 295 Ga. 716, 719 (763 SE2d 675) (2014) (no *Brady* violation where the defendant "failed to show that the State either possessed or

36

suppressed any favorable evidence").

7. Reed further argues that the trial court committed reversible error by refusing his request for a continuance to allow his counsel time to investigate Feggins, whom he contends was a "surprise witness" for the State.

"All applications for continuances are addressed to the sound legal discretion of the court and . . . shall be granted or refused as the ends of justice may require." OCGA § 17-8-22. See also *Anglin v. State*, 312 Ga. 503, 510 (2) (a) (863 SE2d 148) (2021) ("A trial court has broad discretion in granting or denying a motion for continuance."). "Without a clear showing of abuse of this broad discretion, this Court will not disturb a trial court's decision to deny a motion for continuance." *Phoenix v. State*, 304 Ga. 785, 788 (2) (822 SE2d 195) (2018).

Under OCGA § 17-16-8 (a), not later than ten days before trial, the State is generally required to identify all its witnesses for trial and provide specific information about them to the defense, unless

the trial court permits an exception for good cause.[17] The record

shows that five to six days before trial, around April 27 or 28, 2011,

Prickett's trial counsel served the State with a defense witness list

that included Feggins's name, among others, and a handwritten

witness statement from Feggins showing a phone number. The

record contains no evidence that the State had knowledge of Feggins

before Prickett's counsel named her as a potential witness. On April

29, the State filed a Supplemental Certificate of Discovery attaching

the witness statements provided by Prickett's counsel, along with a

copy of an email the State sent the day before notifying Reed's

counsel that the State was interviewing the witnesses on Prickett's

list and that it intended to call one of them (not Feggins) at trial and

offering to provide the witness statements if Reed's defense did not

---

[17] OCGA § 17-16-8 (a) provides:

The prosecuting attorney, not later than ten days before trial, . . . shall furnish to the opposing counsel . . . the names, current locations, dates of birth, and telephone numbers of that party's witnesses, unless for good cause the judge allows an exception to this requirement, in which event the counsel shall be afforded an opportunity to interview such witnesses prior to the witnesses being called to testify.

have them.

On the first day of trial, Monday, May 2, the State filed a certificate showing service of a subpoena on Feggins, and two days later, after the jury was selected, Reed's counsel objected to Feggins's testifying, saying that she felt "ambushed" by the witness. The prosecutor represented that the State only learned of Feggins from Prickett's counsel and interviewed Feggins the previous Friday. The prosecutor indicated that the State had served Feggins with a subpoena in case Prickett decided not to call her and said that the State might call Feggins depending on how the evidence developed. The trial court reserved ruling on the issue at that time.

Later the same day, after the State had presented eight witnesses, the prosecutor announced that it intended to call Feggins as a witness the next day. The prosecutor represented that Feggins would provide exculpatory testimony for Prickett and "damning information" for Reed. Reed's counsel again objected and requested that the trial court bar Feggins's testimony or grant Reed a continuance to allow the defense to fully investigate Feggins. The

trial court denied Reed's request for a continuance, stating that it found no violation of the discovery statutes by the State, but the court stated that Reed's counsel would be given time to interview Feggins before she testified.

The State did not call Feggins as a witness until Friday, May 6, two days after announcing its intent to put her on the stand. Reed's counsel filed an amended motion seeking to bar Feggins from testifying or, in the alternative, for a continuance, asserting that the defense had not been provided complete information for Feggins, such as a date of birth. The State represented that it had supplied the information it had and offered to provide Reed's counsel with a printout of Feggins's criminal history, if any. The trial judge denied Reed's amended motion, but directed that the State provide counsel with the printout and date-of-birth and stated that he would delay the proceedings to allow Reed's counsel to interview Feggins. The trial judge further stated that if counsel identified "anything else concrete" that the defense needed based on the interview and the information provided, he would consider that issue at the time it was

raised. The record indicates that the State supplied the printout, which the prosecutor asserted did not contain anything the defense could use to impeach Feggins, and it appears that Reed's counsel was afforded the opportunity to interview Feggins during a recess in proceedings. The record contains no further request for information or a continuance from Reed's counsel before Feggins testified later that day.

Based on this record, we cannot say that that the trial court abused its discretion in denying the motion for continuance. See *Brittian v. State*, 299 Ga. 706, 707-08 (2) (791 SE2d 810) (2016) (no abuse of discretion in denying motion for continuance where State added sixteen new witnesses ten days before trial and the trial court ensured that, during the course of the trial, the defendant would be provided with an opportunity to interview the witnesses who testified); *Norris v. State*, 289 Ga. 154, 156 (2) (709 SE2d 792) (2011) (finding no abuse of discretion in denial of continuance after state amended witness list less than ten days before trial to add forty-five new witnesses, two of whom were previously unmentioned in the

State's discovery, and failed to provide complete contact information for the other witnesses, where defense was given opportunity to interview the witnesses who were allowed to testify).

8. Reed asserts that he was denied his right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. To succeed on his claims of ineffective assistance of counsel, Reed must satisfy both prongs of the test set out in *Strickland*, 466 U.S. at 687 (III).

> First, [Reed] must show counsel's performance was deficient by showing counsel made errors so serious that he was not functioning as the counsel guaranteed to him by the Sixth Amendment. [Reed] must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. Second, [Reed] must show the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious that they likely affected the outcome of the trial.

*Kilpatrick v. State*, 308 Ga. 194, 201 (7) (839 SE2d 551) (2020) (citations and punctuation omitted). To establish the requisite prejudice, therefore, Reed must demonstrate "a reasonable probability that, in the absence of counsel's deficient performance,

42

the result of the trial would have been different[,] . . . [which means] a probability sufficient to undermine confidence in the outcome." *Hood v. State*, 308 Ga. 784, 786 (2) (843 SE2d 555) (2020) (citations and punctuation omitted). See also *Strickland*, 466 U.S. at 694 (III). Because an appellant must satisfy both *Strickland* prongs, we need not "approach the inquiry in the same order or even . . . address both components of the inquiry if [the appellant] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697 (IV).

(a) Reed contends that his trial counsel provided ineffective assistance by failing to object to his absence at the bench conferences identified in the Stipulation, in violation of his right to be present at all critical stages of his trial. However,

> [w]hen an alleged violation of the Georgia constitutional right to be present is raised not directly but rather as a claim of ineffective assistance of counsel, the defendant must show both that his lawyer acted deficiently in not asserting his right and that this deficiency caused actual prejudice to the outcome of his trial.

*Hardy*, 306 Ga. at 661 (3) (citation and punctuation omitted). See also *Peterson v. State*, 284 Ga. 275, 276, 280 (663 SE2d 164) (2008).

As discussed above, Reed has made no attempt to show that he had a right to be present at any of the identified bench conferences except the one bench conference during voir dire in which the prospective juror with the medical condition was questioned. And even if we were to assume that Reed's trial counsel performed deficiently in waiving his presence at that conference, Reed has failed to show that his counsel's waiver caused him any prejudice. Reed has made no argument, for example, that if he had attended that conference, he would have objected to the dismissal of that juror on the basis of hardship. In any event, Reed has not shown a reasonable probability that but for his trial counsel's waiver of his presence at any of the bench conferences, the outcome of his trial would have been different. Therefore, Reed's claim on this ground fails. See *Hardy*, 306 Ga. at 661 (3).

(b) Reed also asserts that his trial counsel performed deficiently by failing to ensure a complete transcription of his trial, in particular the unrecorded bench conferences, in violation of OCGA § 5-6-41. However, even if we assume that trial counsel was

deficient in this regard, we concluded in Division 5 that Reed failed to show any prejudice resulting from the missing portions of the transcript in Reed's ability to prepare his appeal, and we further conclude that he cannot show a reasonable probability that the incomplete transcript affected the outcome of the trial, as required to establish a claim of ineffective assistance of counsel.

(c) Reed further argues that his trial counsel rendered ineffective assistance of counsel when he failed to object to a "presumption of truthfulness" pattern jury charge given by the trial court because that charge had previously been disapproved by this Court 25 years earlier. See *Noggle v. State*, 256 Ga. 383, 385-86 (4) (349 SE2d 175) (1986) (stating that the presumption of truthfulness charge given in that case could be misleading and was of little positive value).

> The trial court gave the following jury charge:
>
> When you consider the evidence in this case, if you find a conflict, you should settle this conflict, if you can, without believing that any witness made a false statement. If you cannot do so, then you should believe that witness or those witnesses whom you think are most -- whom you

think are best entitled to belief. You must determine what testimony you will believe and what testimony you will not believe.

Reed argues that this language instructed the jury that they should believe a witness unless it is proven the witness is not worthy of belief, which shifts the burden to the defendant to discredit a witness.

However, any objection to this charge would have been meritless, as at the time of Reed's trial this Court had held that a charge similar to the one given in this case is not a "presumption-of-truthfulness" instruction like the charge disapproved in *Noggle* and was a permissible charge. See *Mallory v. State*, 271 Ga. 150, 151 (2) (517 SE2d 780) (1999). In that case, we noted that the two charges are "distinctly different," explaining that the charge disapproved in *Noggle*

> established a presumption that witnesses speak the truth unless they are impeached, that is, that an unimpeached witness must be believed. By contrast, the charge involved here contains no suggestion that an unimpeached witness must be believed, but merely urges the jury to attempt to reconcile conflicting testimony before considering the credibility of witnesses.

46

Id. See also *Smith v. State*, 292 Ga. 588, 590 (3) (740 SE2d 129) (2013) (holding that the pattern charge given was not a presumption-of-truthfulness charge); *Guyton v. State*, 281 Ga. 789, 791 (2) (642 SE2d 67) (2007) (same). Therefore, at the time of Reed's trial in 2011, the existing precedent held that the use of the charge in this case was not error. See *Mallory*, 271 Ga. at 151 (2); *Guyton*, 281 Ga. at 791 (2). Because the failure to make a meritless objection cannot form the basis of a claim of ineffective assistance of counsel, see *Moss v. State*, 298 Ga. 613, 617 (5) (a) (783 SE2d 652) (2016), "we cannot say that [trial] counsel performed in an objectively unreasonable way by failing to object to a pattern jury instruction that had been approved by controlling case law at the time of [defendant's] trial." *Smith v. State*, 308 Ga. 81, 89 (3) (839 SE2d 630) (2020).[18]

---

[18] For purposes of analysis, we have assumed two deficiencies on the part of trial counsel, each of which we found to be harmless. Reed does not argue that that these deficiencies cumulatively resulted in prejudice, and we discern no apparent cumulative prejudice on this record. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[A] defendant who wishes to take advantage of

9. Reed argues that the trial court improperly sentenced him to life in prison under both Counts 1 and 2 (malice murder and felony murder respectively), when the felony murder conviction stood vacated by operation of law. The State agrees and concedes that the trial court erred in sentencing Reed on the felony murder count. See *Lucky v. State*, 286 Ga. 478, 480 (2) (689 SE2d 825) (2010) (when the jury returns guilty verdicts on both felony murder and malice murder charges in connection with the death of one person, defendant should be sentenced only on malice murder).

Accordingly, we affirm the judgment of conviction for malice murder under Count 1 and vacate the judgment of conviction for felony murder under Count 2. See *Lucky*, 286 Ga. at 482 (2). And because Reed's sentence for possession of a firearm during the commission of a felony under Count 5 was run consecutively to his sentence in Count 2, which now stands vacated, we remand the case to the trial court for resentencing.

*Judgment affirmed in part and vacated in part and case*

the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").

*remanded for resentencing. All the Justices concur.*